[Civ. No. 56347. Second Dist., Div. Four. Dec. 21, 1979.]

W. E. J. et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
F. L., Real Party in Interest.

COUNSEL

Palmer & Bartenetti, Philip W. Bartenetti, Clark & Trevithick, Donald P. Clark and Dolores Cordell for Petitioners.

No appearance for Respondent.

Garber & Rudof and J. M. Groshan for Real Party in Interest.

OPINION

FILES, P. J.—■  This original proceeding requires us to determine whether or not the biological father of a nonmarital child, who is not a "presumed father" as defined in Civil Code section 7004,[1] holds the power to veto a proposed adoption. Our conclusion is that, although the biological father is entitled to be heard in opposition to the adoption proceedings, and to present his own qualification for custody, the adoption may be ordered without his consent as is provided in section 7017, subdivision (d), and section 224.

The underlying superior court proceeding commenced with a petition filed August 31, 1978, by Mr. and Mrs. J., husband and wife, for the adoption of Baby Boy G., born August 23, 1978. Although the entire

[1]All section numbers hereinafter refer to the Civil Code.

file of the superior court has not been brought up, the papers here show that the order we review was based on these facts: The baby's mother, Ms. G., released her child to Mr. and Mrs. J. the day after his birth, and the child has been with them ever since. The biological father, F.L., was, at the time of conception, and still is, married to a woman other than Ms. G.[2]

F.L. appeared in the adoption proceeding, with counsel, and sought custody of the child. Following a hearing the trial court made an order on May 10, 1979, finding that F.L. was "entitled to the custody of minor" and directing the Js. to surrender custody of the minor on or before June 1, 1979.

The Js. filed their petition here on May 23 seeking a prerogative writ to review the May 10 order, and this court stayed operation of the superior court's order. The Js. have also appealed from the May 10 order, but we have elected to go forward with the writ proceeding to arrive at an earlier decision.

The precise issue is whether the trial court acted properly in awarding custody to F.L. The colloquy with counsel, and the trial court's statement of its reasoning on May 10 reveal that the award of custody was based upon the trial court's views of the law relating to the adoption. Counsel for F.L. urged that the biological father was entitled to custody both by reason of constitutional principles expressed in *Caban* v. *Mohammed* (1979) 441 U.S 380 [60 L.Ed.2d 297, 99 S.Ct. 1760] and in order to qualify F.L. as a "presumed father" who would thereby acquire a veto power under Civil Code section 7017, subdivision (d), as interpreted in *In re Tricia M.* (1977) 74 Cal.App.3d 125 [141 Cal.Rptr. 554].

The May 10 order declares that the court "shall decide parentage and the applicability of '*Caban*' on June 19, 1979." We also note that although the order contains the finding "that it would *not* be harmful or detrimental to the minor to award custody to the natural father..." there is no finding that the change of custody was in the child's best in-

---

[2]A memorandum of law submitted on behalf of F.L. asserts that he testified in the trial court that at the time the child was conceived Ms. G. agreed that F.L. and his wife would raise the child. We regard the assertion as immaterial to our decision for the reason that an agreement between parents with respect to child custody does not limit the power of the court. (See *Puckett* v. *Puckett* (1943) 21 Cal.2d 833, 839 [136 P.2d 1].)

terest. The transcript leaves no doubt that the decision was based upon the trial court's conclusion that F.L. was "entitled to custody" under the law as the court then viewed it.

We first undertake an analysis of the provisions of the "Uniform Parentage Act" as adopted in California effective January 1, 1976. That act (§§ 7000-7018), together with changes concurrently made elsewhere in the codes, eliminated the concept of illegitimacy (§ 7002) and established procedures for identifying parents and declaring the parent-child relationship. For the male parent the act uses two distinct terms: "natural father" and "presumed father." The definition of the latter term is in section 7004.[3]

Upon the information which was before the court on May 10, 1979, F.L. was not within the statutory definition of "presumed father," since he and the mother had never attempted to marry, and the child had never been in his home. The importance of this classification appears in

---

[3]Section 7004: "(a) A man is presumed to be the natural father of a child if he meets the conditions as set forth in Section 621 of the Evidence Code or in any of the following subdivisions:

"(1)   He and the child's natural mother are or have been married to each other and the child is born during the marriage, or within 300 days after the marriage is terminated by death, annulment, declaration of invalidity, or divorce, or after a decree of separation is entered by a court.

"(2)   Before the child's birth, he and the child's natural mother have attempted to marry each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and,

"(i)   If the attempted marriage could be declared invalid only by a court, the child is born during the attempted marriage, or within 300 days after its termination by death, annulment, declaration of invalidity, or divorce; or

"(ii)   If the attempted marriage is invalid without a court order, the child is born within 300 days after the termination of cohabitation.

"(3)   After the child's birth, he and the child's natural mother have married, or attempted to marry, each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and

"(i)   With his consent, he is named as the child's father on the child's birth certificate, or

"(ii)   He is obligated to support the child under a written voluntary promise or by court order.

"4)   He receives the child into his home and openly holds out the child as his natural child.

"(b)   Except as provided in Section 621 of the Evidence Code, a presumption under this section is a rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence. If two or more presumptions arise under this section which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls. The presumption is rebutted by a court decree establishing paternity of the child by another man."

section 7017, which, after setting forth the procedure for identifying and notifying the natural father, provides in subdivision (d): "If the court finds that the man representing himself to be the natural father is a presumed father under subdivision (a) of Section 7004, then the court shall issue an order providing that the father's consent shall be required for an adoption of the child. In all other cases, the court shall issue an order providing that only the mother's consent shall be required for the adoption of the child."

This particular language does not appear in the Uniform Parentage Act as drafted by the National Conference of Commissioners on Uniform Laws. (See 9A U. Laws Ann. (Master ed. 1979) 587, 616.)

It is apparent that the term "presumed father" as used in section 7017 does not denote a presumption in the evidentiary sense at all. Rather it uses that term as a convenient means of identifying a class by reference to section 7004.

A corresponding amendment to section 224 was made by the same act which created section 7017. The amended section 224 contains these words: "A child having a presumed father under subdivision (a) of Section 7004 cannot be adopted without the consent of its parents, if living;...nor a child with no presumed father under subdivision (a) of Section 7004 without the consent of its mother, if living;..."

The effect of this classification is that a man may be able to show that he is indisputably the biological father of the child, but he may not hold a power to veto an adoption because he does not come within the class defined by reference to section 7004. Loosely speaking, the classification distinguishes between the father who has established some kind of family tie with the child, and one whose relationship is purely biological.

This classification reflects the Legislature's resolution of a long-recognized tension between the best interests of the child and the personal desires of a male parent who has neither gone through a marriage ceremony with the mother nor shared a home with the child.

The core of that long-standing problem has been described thus: "The state exercises its authority in situations involving dependent and neglected children, in divorce proceedings involving custody disputes, in appointment of guardians for children and in adoptions. Only in adop-

tion proceedings, however, are the rights and obligations of the child's biological parents absolutely severed. In dependency, neglect, custody and guardianship proceedings, the child's best interest is *always* the paramount consideration. In adoption, however, the child's best interest may be the paramount consideration *only* if the presumption in favor of the biological parent is overcome. [Fns. omitted.]" [Italics in original.] (Egginton & Hibbs, *Termination of Parental Rights in Adoption Cases: Focusing on the Child* (1975) 14 J. Fam. L., 547, 549-550.)

An article written for the California Law Revision Commission after the enactment but prior to the effective date of the Parentage Act reviews the developments of the law which have enlarged the discretion of the court to act in the child's best interest in limited kinds of situations. (Bodenheimer, *New Trends and Requirements in Adoption Law and Proposals for Legislative Change* (1975) 49 So.Cal.L.Rev. 10.)

The article (at pp. 52-53) states the case for the limiting provisions which the 1975 enactment placed in sections 224 and 7017: "Present adoption laws distinguish between marital and nonmarital children primarily in one respect: the adoption of marital children requires the consent of both parents, whereas a nonmarital child may be adopted without the consent of the father.

"There is no question that the present law adversely affects the *unwed father's interest* by ignoring his very existence in the adoption process. From the point of view of the *child's interest*, the picture looks entirely different. If the child has lived with the unwed father at any time, the father's participation in the adoption is assumed, at least under California law, which legitimizes the child under such circumstances and consequently requires the father's consent. If the father is unknown or hardly known to the child, any move to achieve absolute equality between married and unmarried fathers by extending the consent requirement to unwed fathers is of dubious benefit to the child, and may in fact be in direct conflict with the child's interest. Giving the father who is a stranger the right to veto an adoption may be a decided detriment to a child who is settled in an adoptive home. In such a case and in many other situations it will be in the child's interest to have the adoption go forward without delay and without the obstacle of a father's refusal or withholding of consent. While there may be a latent or actual interest in knowing one's biological father and perhaps also in living with him, this interest may be protected in other ways

than a grant of a veto power over an adoption. The father will be given an opportunity to be heard in the adoption proceeding to assert his interest. Certainly the nonmarital *child's* rights recognized by the Supreme Court are not violated by distinguishing between married and putative *fathers* for purposes of consent to adoption. [Fns. omitted.]" [Italics in original.]

With respect to the biological father's demand for equality, the writer states: "The extreme view that all unmarried fathers are to be accorded equal custody rights with the mother (and on a par with married fathers) would have disastrous consequences for the child. Every unmarried father would then have the power to block an adoption by withholding consent, and would be in a position to remove the child from the mother. It is one thing to recognize the father's custodial rights when father and mother are living together as a de facto family, or when the children live with the father. California law accords the father custody rights under such circumstances. It is quite another matter to extend equality of custody to the father who is a stranger to the child. [Fn. omitted.]" (*Id.* at pp. 57-58.)

The application of the new Parentage Act classification was before this court in *Adoption of Marie R.* (1978) 79 Cal.App.3d 624 [145 Cal.Rptr. 122]. In that case, as here, the mother had turned over her nonmarital infant to a couple who desired to adopt. A man claiming to be the biological father offered to receive the infant into his home and to provide support, but the mother refused the offer. The father objected to the adoption and contended that, since he had done everything he could do to provide a home for the child, his tender was enough to give him the status of "presumed father," and to exercise the veto which the code gives to a male who is so classified. The trial court accepted that theory and made an order that the adoption not proceed because of the objection of the father. That order was reversed because the father had no veto power. We also considered and upheld the constitutionality of the classification, citing *Quilloin* v. *Walcott* (1978) 434 U.S. 246 [54 L.Ed.2d 511, 98 S.Ct. 549]. In so deciding we recognized that, with respect to a nonmarital child, the mother may, by her conduct, prevent the male from acquiring the status of "presumed father" which would have given him a veto over adoption. (27 Cal.App.3d at p. 630.)

*In re Tricia M., supra,* 74 Cal.App.3d 125 was an appeal by a biological father from an order denying him the custody of the child and determining that the child might be released to the county for adoption

on the mother's consent alone. The trial record showed that the trial court had believed that appellant, not being a presumed father, had no right to custody. The trial court had stated "I don't think the matter of the best interests of the child is before me." (74 Cal.App.3d at p. 137, fn. 7.)

The Court of Appeal reversed and remanded so that the trial court might consider the child's best interest. The appellate court pointed out that, although the father was not a presumed father, and as such had no statutory veto power, nevertheless he was entitled to a decision as to whether giving him custody would be in the child's best interest.

Although this decision and the grounds upon which it rests are unquestionably correct, the opinion went further and offered some advice to the trial court which was unwarranted by the Parentage Act. The appellate court suggested that if the trial court were to award custody to the biological father, he would thereby become a "presumed father" under sections 7004 and 7017 as one who "receives the child into his home."

Such an interpretation ignores the function of the classification which section 7017, subdivision (d), provides. The statutory purpose is to distinguish between those fathers who have entered into some family relationship with the mother and child and those who have not. That purpose is not served by making the child a talisman which the court may hand to a biological father pendente lite for the purpose of changing his classification.

Furthermore, there is no need for this talismanic ritual. If the court finds that in fact the best interests of the child require that custody go to the biological father the court may so order, thereby forestalling the need for an adoption. This result may be accomplished without giving the father a veto power.

Both in *Tricia M.* and in the present case the trial court erred in assuming that the statutory classification deprived the court of discretion to consider the child's best interests, as between the biological father's demand for custody and the mother's wish to place the child for adoption.

*In re B. G.* (1974) 11 Cal.3d 679 [114 Cal.Rptr. 444, 523 P.2d 244], also requires consideration. The children involved there, born in 1963

and 1964, respectively, had been brought to California in 1969 by the father, a political refugee from Czechoslovakia. The mother had remained behind. The father died four months after his arrival and the children became dependents of the juvenile court, which placed them in a foster home. Sometime later the mother learned of the juvenile court proceeding and engaged an attorney to seek a return of her children. At a hearing in 1972 the juvenile court made a finding that the best interests of the children required that they be continued as dependent children of the court and ordered that they be so maintained in a foster home. The Supreme Court reversed. The opinion determined first that Civil Code section 4600 governed the award of custody even though the order was made in the juvenile court. The basis of the Supreme Court's reversal was its conclusion "that section 4600 permits the juvenile court to award custody to a non-parent against the claim of a parent only upon a clear showing that such award is essential to avert harm to the child. A finding that such an award will promote the 'best interests' or the 'welfare' of the child will not suffice. [Fn. omitted.]" (11 Cal.3d at pp. 698-699.)

We must consider whether that standard is applicable to the present case. *In re B. G.* may not be distinguished as purely juvenile court law, because the *B. G.* court held that the substantive standard for custody decisions should not depend upon the procedural setting. The differences here are in the relationships between the child and the respective claimants. *In re B. G.* was a contest for the custody of marital children, whom the mother had never abandoned, as between the mother and a court-selected foster home. In our case the choice is between a proposed adoption into a family selected by the mother and a father who has established neither a marital or family relationship with the mother and child. Our case is governed by a statute which provides that such a father may be heard with respect to the proposed adoption but may not control it.

The new provision of section 7017, subdivision (d), reflects the Legislature's intent to give greater protection to the child's interests as opposed to the preferences of a purely biological father. In the context of this case the court is not compelled to deliver custody to a biological father who is otherwise a total stranger, solely upon the judicial prediction that the new custody will not be harmful.

If the court proceeds with the adoption, the question of custody becomes moot. The purpose and effect of section 7017 is to allow the court to act for the best interests of the child in this kind of contest.

■ We turn next to the constitutional issue which has been raised. A recent series of decisions by the United States Supreme Court has established some guide posts.

In *Stanley* v. *Illinois* (1972) 405 U.S. 645 [31 L.Ed.2d 551, 92 S.Ct. 1208], the father and mother had never married, but had lived together intermittently, and he had held out their children as his own. When the mother died, the state took the children. The high court held that, under due process and equal protection principles, the state was not entitled to take the children without notice to the natural father and a hearing on his fitness. The California law meets this standard. In a proceeding to terminate parental control a citation must be served on the parents and they are entitled to appear with counsel, which will be provided at state expense if a parent is not able to afford counsel. (§§ 235, 237.5.)

In *Quilloin* v. *Walcott, supra*, 434 U.S. 246, the child was born to a couple who had never married or established a home together. The mother married Walcott who petitioned to adopt the child, age 12, with the mother's consent. The biological father's objection was overruled because of a Georgia statute which denied the unwed father any power to prevent the adoption of his child. The high court held that this statute was constitutional as applied to those facts.

*Quilloin*, which arose out of facts quite different from the case here, illustrates the principle that a father whose relationship to the child is only biological may be treated differently from a father who has established a family relationship with the child and mother. A further illustration appears in *Parham* v. *Hughes* (1979) 441 U.S. 347 [60 L.Ed.2d 269, 99 S.Ct. 1742], upholding a statute which denied to fathers of illegitimate children the right to recover damages for the wrongful death of the child, although such recovery was allowed to all fathers who had legitimated their children and all mothers.

In *Caban* v. *Mohammed, supra*, 441 U.S. 380, the unmarried parents had lived together for five years as husband and wife, during which period two children were born to them. They then separated and the mother married Mohammed. Eventually Mohammed sought to adopt the children with the mother's consent. The father, Caban, and his wife also sought adoption. Under New York law an unwed mother could veto an adoption, but an unwed father could not. The New York decision granting the Mohammeds' petition for adoption was reversed upon

the ground that the gender-based distinction in the state law was unconstitutional.

The *Caban* opinion must be read in the light of its factual situation. Under California law, Caban would have been classified as a presumed father, entitled to veto any proposed adoption under sections 224 and 7017, subdivision (d).

The *Caban* opinion struck down a New York statute (referred to in the opinion as § 111) upon the ground that it created an overbroad gender-based discrimination between all unmarried fathers and all unmarried mothers. The facts of the *Caban* case illustrated the injustice of that discrimination as applied to parents who had lived as a family for years. The opinion carefully pointed out that appropriately limited distinctions between the rights of the mother and the rights of the father are not necessarily improper.

In footnote 13 on page 392 [60 L.Ed.2d, p. 307] the *Caban* opinion added this qualification: "We note some alternatives to the gender-based distinction of § 111 only to emphasize that the state interests asserted in support of the statutory classification could be protected through numerous other mechanisms more closely attuned to those interests."

The California statute which took effect in 1976 avoids the fault of discriminating between all unwed mothers and all unwed fathers. The statutory classification sets apart those biological fathers who have neither gone through an apparently valid marriage ceremony with the mother nor lived with the child as a parent.

The interest at stake is the power to veto an adoption which the mother and court might find to be in the best interest of the child.

Those biological fathers who are denied the veto power are easily distinguished from those who hold that power. Members of this class have neither expressed the interest which is implied in the marriage ceremony nor undertaken the care of the child in a common home. The Legislature was not unreasonable in concluding that that class will contain a substantial proportion of fathers who are strangers to the child and whose objection to adoption will be based upon something other than a mature consideration of the child's best interest. The protection of the child is well recognized as an important state interest.

To the extent that this classification is based upon gender, it is based upon an actual difference in situation. Whatever else may be said of an unwed mother, she is not a stranger to her child. A gender-based classification is not improper where men and women are not similarly situated. (See *Schlesinger* v. *Ballard*, 419 U.S. 498 [42 L.Ed.2d 610, 95 S.Ct. 572].)

In *Caban* the court rejected the argument that unwed mothers as a class were closer to their children than unwed fathers, because, as the child develops, it may have a relationship with the father comparable to that of the mother. But the classification made by the California statute is limited to those fathers who have not formed the psychological relationship which develops between the child and the adult who provides for its needs. The limited classification provided in section 1707, subdivision (d), does meet constitutional standards in that it relates to an important state interest and does not go substantially beyond the protection of that interest.

It follows that if the biological relationship claimed by F.L. remains unchallenged, he may pursue his request for custody based upon his parenthood and may oppose the petition of Mr. and Mrs. J. for adoption on any legal ground. But he has no personal veto power. Nor will an award of temporary custody, pendente lite, confer upon him a power to veto the adoption.

On remand it will be the duty of the trial court to exercise its legal discretion with respect to the issues raised by the conflicting applications of the parties. A new hearing is required because the order appealed from was influenced by an erroneous view of the scope of the court's discretion.

Let a writ of mandate issue requiring the respondent court to vacate its order of May 10, 1979, and conduct a new hearing. The stay order heretofore issued by this court shall remain in effect until respondent complies with this judgment.

**KINGSLEY, J.**—I concur. I agree with the analysis of the applicable statutes and cases set forth in Justice Files' opinion. What that opinion orders is entirely consistent with Justice Jefferson's concern for the parent-child relationship between this father and the child. The trial court is directed (as it has not yet done) to consider, whether it will be adverse to the best interests of the child to give custody to the father. If it

so concludes, it may then proceed with the adoption. If, however, it should conclude that custody in the father would not be adverse to the best interests of the child, it may award custody to the father and deny the petition for adoption. But to foreclose any inquiry into the respective claims of the biological father and the would-be adopters, by making the biological father a "presumed" father merely because of the biological father's act of causing conception is contrary to all of the public policy of this state.

**JEFFERSON (Bernard), J.**—I dissent.

I disagree with the majority's holding that a natural father of a nonmarital child has no power to veto the adoption of his child if such father is not a "presumed natural father" as that term is defined in Civil Code section 7004. In so holding, the majority determines that the trial judge's order—giving the unmarried natural father custody of his nonmarital child to enable him to become a "presumed natural father" with power to veto the adoption of his child—was beyond the jurisdiction of the trial judge.

The history of the proceedings in the case at bench is of more than slight importance. The child involved, Baby Boy G., was born on August 23, 1978. Three days later, the mother, Ms. G., placed the baby with Mr. and Mrs. J., who filed an adoption proceeding on August 31, 1978, which is only eight days after the birth of Baby Boy G. The father of Baby Boy G., F.L., not married to the mother, has objected to the adoption and has sought custody of his child as a part of the proceedings involved herein.

I consider that this case presents two issues: First, the question of the *proper interpretation of various provisions of the Uniform Parentage Act* (Civ. Code, § 7000 et seq). Second, the question of whether Civil Code section 7017, subdivision (d), and Civil Code section 224, constitute a violation of the equal protection rights of an unmarried father in dispensing with his consent to the adoption of his child while requiring the unmarried mother's consent to such an adoption.

I

*Does Civil Code Section 7017, Subdivision (d),*
*Preclude the Trial Court From Granting Custodial Rights*
*to an Unmarried Father Prior to Ruling on an Adoption*
*Petition in Order to Enable Such Unmarried Father to*
*Become a Presumed Natural Father Within the Meaning of*
*Civil Code Section 7004?*

It is the view of the majority that the focus of the Uniform Parentage Act that was enacted in 1975 was to make the best interests of a child always the paramount consideration and to make the parental interest a subordinate one. For this view the majority quotes from Egginton & Hibbs, *Termination of Parental Rights in Adoption Cases: Focusing on the Child* (1975) 14 J. Fam. L., 547, 549-550 and from Bodenheimer, *New Trends and Requirements in Adoption Law and Proposals for Legislative Change* (1975) 49 So.Cal.L.Rev. 10. I find the views of these authors to be neither persuasive nor convincing. I believe that the major public policy that undergirds the Uniform Parentage Act is that of favoring a "parent and child relationship," even though that relationship is one of an unmarried parent and child. This emphasis replaces the former public policy that emphasized the promotion of "legitimacy." Consequently, the provisions of the Uniform Parentage Act should be interpreted to promote the parent and child relationship between an unmarried father and his child as well as to promote the relationship between an unmarried mother and that same child.

The public policy to promote an all-embracive parent and child relationship that undergirds the Uniform Parentage Act has been described by the decisional law as follows: "Under the Uniform Parentage Act (Civ. Code, § 7000 et seq., enacted Stats. 1975, ch. 1244) the 'child and parent relationships' extend equally to every child and to every parent regardless of the marital status of the parent. All statutory references to 'legitimacy' and 'illegitimacy' are eliminated. The major premise of the act is to provide for substantive equality of children regardless of the marital status of the parents. The right-duty relationship existing between the parent and child are equalized without reference to the marital status of the parents, without regard to sex." (*Griffith v. Gibson* (1977) 73 Cal.App.3d 465, 470 [142 Cal.Rptr. 176]; fn. omitted.)

In addition to the Uniform Parentage Act, other fairly recent legislation has declared that the policy in favor of a "parent and child relationship" is the primary fact of importance in family relationship, rather than former statutory provisions that emphasized "legitimacy." (See Stats. 1975, ch. 1244, §§ 15-20, pp. 3202-3203.)

Civil Code section 7017, which deals with the subject of "adoption," provides for proceedings to identify the natural father of a child and to determine the rights of the father. Subdivision (d) of section 7017 provides: "If, after the inquiry, the natural father is identified to the satisfaction of the court, or if more than one man is identified as a pos-

sible father, each shall be given notice of the proceeding in accordance with subdivision (f).... If any of them fails to appear or, if appearing, fails to claim custodial rights, his parental rights with reference to the child shall be terminated. If the natural father or a man representing himself to be the natural father, claims custodial rights, the court shall proceed to determine parentage and custodial rights in whatever order the court deems proper. If the court finds that the man representing himself to be the natural father is a presumed father under subdivision (a) of Section 7004, then the court shall issue an order providing that the father's consent shall be required for an adoption of the child. In all other cases, the court shall issue an order providing that only the mother's consent shall be required for the adoption of the child." Subdivision (f) of Civil Code section 7017, referred to in subdivision (d), provides: "Notice of the proceeding shall be given to every person identified as the natural father or a possible natural father in accordance with the provisions of the Code of Civil Procedure for the service of process in a civil action in this state, provided that publication or posting of the notice of the proceeding shall not be required. Proof of giving the notice shall be filed with the court before the petition is heard. However, if a person identified as the natural father or possible natural father cannot be located or his whereabouts are unknown or cannot be ascertained, the court may issue an order dispensing with notice to such person."

A key provision of Civil Code section 7017, subdivision (d), is the provision that if a natural father or one who claims he is a natural father, seeks custody of his child, "the court shall proceed to determine parentage and custodial rights in whatever order the court deems proper." In view of the supremacy of the objective of promoting a "parent and child relationship" under the Uniform Parentage Act, subdivision (d) of Civil Code section 7017 ought to be interpreted to require a trial court to grant custody of his child to an unmarried father who seeks such custody and thus enable him to become a "presumed natural father." The father's consent to the adoption of his child would then be required in order for such an adoption to be effectuated. Under such an interpretation of Civil Code section 7017, subdivision (d), the trial court in the case at bench acted properly in making its order granting custody of the child, Baby Boy G., to his father, F.L.

The presumed-natural-father requirement that would be satisfied by the granting of custody to an unmarried natural father is set forth in Civil Code section 7004. Under subdivision (a)(4) of this section, a man

will be presumed to be the natural father of a child if "[h]e receives the child into his home and openly holds out the child as his natural child."

An interpretation of Civil Code section 7017, subdivision (d), somewhat similar to the one I suggest, was made in *In re Tricia M.* (1977) 74 Cal.App.3d 125 [141 Cal.Rptr. 554]. The *Tricia M.* court was concerned especially with the problem of an unmarried father who was precluded by the purposeful actions of the mother from becoming a "presumed natural father" through receiving his child into his home and openly holding out the child as his natural child. It was in this context that the *Tricia M.* court stated: "Where the mother has frustrated the natural father's efforts to hold the child out as his, the court may, in a proper case, first grant him custody, allow him to complete the conduct necessary under section 7004, subdivision (a)(4) to establish himself as a presumed father, and then make the appropriate order." (*Tricia M., supra,* 74 Cal.App.3d 125, 134.) "The appropriate order" referred to by the *Tricia M.* court in this situation would involve a finding and order that a man who is in fact the unmarried natural father of the child is a "presumed natural father" under Civil Code section 7004, subdivision (a)(4), by virtue of obtaining custody of his child with the consequence that he has received the child into his home and has openly held out the child to be his natural child. The court would then make an order, pursuant to Civil Code section 7017, subdivision (d), that the father's consent shall be required for an adoption of the child.

The majority makes reference to the case of *Adoption of Marie R.* (1978) 79 Cal.App.3d 624 [145 Cal.Rptr. 122], which was before this court. The facts in the *Marie R.* case are substantially similar to the facts presented in the case at bench. In *Marie R.,* the mother of the unmarried father's child, immediately after the birth of the child, turned the child over to a couple who desired to adopt the child. Before this transfer was made, however, the father offered to take the child into his home and provide for its support, but the mother refused the father's offer. The father objected to the consummation of the adoption proceeding and contended that he should have been considered the "presumed natural father" for purposes of his consent being required for the adoption.

In spite of the fact that the mother had frustrated his efforts to receive the child into his home and openly hold out the child as his natural child, the majority in the *Marie R.* case held that it was immaterial that the mother had frustrated the unmarried father's efforts to

become a "presumed natural father" within the meaning of Civil Code section 7004, subdivision (a)(4), and that, under Civil Code section 7017, subdivision (d), only the mother's consent was required for the adoption. I dissented in the *Marie R.* case on the ground that the evidence presented there was sufficient for a finding that there had been a "constructive" taking of the child into the father's home to support the trial court's order that the unmarried natural father had become a "presumed natural father" entitled to the custody of his child and to block the child's adoption by refusing to give his consent thereto.

I consider the majority's decision in *Marie R.* to have been erroneous, and I consider that the majority's holding in the case at bench is equally erroneous, indefensible and untenable.

The majority takes the view that the *Tricia M.* court and the trial court in the case at bench erred in making an assumption that the statutory scheme of the Uniform Parentage Act deprived the court of discretion to consider the child's best interests as between the natural father's demand for custody and the natural mother's wish to place the child for adoption. It is my view that it is the majority in the case at bench that commits egregious error and not the *Tricia M.* court or the trial court in the case at bench. I can see no rational basis for the majority's view that the unmarried mother's wishes should prevail over those of the unmarried father. In the case before us, the unmarried mother who does not desire custody of her child and does not desire a parent and child relationship with her child, ought not to be placed in the superior position of being able to consent to the adoption of her child and to preclude the unmarried father of her child from obtaining custody and thus being in a position to veto his child's adoption. The majority sanctions this indefensible and unjustifiable view of the law that places such an unmarried mother in a position to prevent the father from exercising a veto power over the adoption by the simple device of not permitting the father to take the child into the father's home to qualify as a "presumed natural father."

The majority relies in part upon *In re B. G.* (1974) 11 Cal.3d 679 [114 Cal.Rptr. 444, 523 P.2d 244], for its view that, under the Uniform Parentage Act, once the unmarried natural mother gives her consent, the trial court may decide that it is for the best interests of the child that such child be adopted without giving the unmarried natural father a right to veto such adoption. But the *In re B. G.* case does not stand for the proposition that, as between the desire of an unmarried natural

father for the custody of his child and the desires of a nonparent to adopt the child and the mother to consent to such adoption, the right of the nonparent to adopt the child takes precedence over the desire of such father for custody of his child, based solely on the trial judge's determination of what constitutes the best interests of the child.

The *In re B. G.* court dealt with making an interpretation of section 4600 of the Civil Code (a part of the Family Law Act). As between parents desiring custody, section 4600 expressed a policy of a preference in accordance with the best interests of the child. But in a dispute between a parent and nonparent over a child's custody, section 4600 requires a greater showing than simply the best interests of the child in order for custody to be awarded to a nonparent as against the claim of a parent.

Thus, the *In re B. G.* court observed: "As enacted, section 4600 expressly recognizes that custody should be awarded to parents in preference to nonparents. As between parents, it permits the court to award custody 'according to the best interests of the child,' but in a dispute between a parent and a nonparent, the section imposes the additional stipulation that an award to the nonparent requires a finding that 'an award of custody to a parent would be detrimental to the child.' Pursuant to the language of this section, the legislative history previously discussed, and the policy of the Juvenile Court Law as set out in section 502, we conclude that section 4600 permits the juvenile court to award custody to a nonparent against the claim of a parent only upon a clear showing that such award is essential to avert harm to the child. A finding that such an award will promote the 'best interests' or the 'welfare' of the child will not suffice." (*In re B. G., supra,* 11 Cal.3d 679, 698-699; fns. omitted.)

The majority finds support from *In re B. G.* by noting a distinction between the family relationships presented in *In re B. G.* and the family relationships presented in the case at bench. Thus, the majority points out that the *In re B. G.* custody contest between a nonparent and a parent involved a custody contest over *marital* children in which, as between a mother who had never abandoned her children and a court-selected foster home, the mother was entitled to prevail unless there was a showing greater than the best interests of the children in order for a nonparent to be given preference. The majority points out that, in the case at bench, as contrasted with the *In re B. G.* situation, we are concerned with nonparents who seek adoption as against the rights of an

unmarried natural father who has not had a parental relationship with his child whose custody is involved. But what the majority overlooks in this analysis is the fact that the natural father, although not married to the mother, has been deprived of any opportunity to develop a parent and child relationship with his child *solely* because of the conduct of the mother in not desiring herself to have a parent and child relationship with her child, and, also, in seeking to deprive the father of their child from obtaining a "parent and child relationship" with their child to enable the father to veto the adoption.

I can find no logic in the majority's position that the provisions of Civil Code section 7017, subdivision (d), reflect a legislative intent to give greater weight to the child's best interests than to the preference of the unmarried (not married to the mother) father for custody of his child. I consider, as did the *Tricia M.* court, that the legislative intent, as manifested by the provisions of the Uniform Parentage Act in general and especially by the provisions of section 7017, subdivision (d), is clearly that of fostering a parent and child relationship between *all* parents and *all* children so that the trial court is compelled to recognize the right of an unmarried father who seeks custody of his nonmarital child to be given that custody by court order so that he is then entitled to preclude a disruption of the parent and child relationship so instituted and formed, by refusing to give his consent to the adoption of his child by a nonparent.

The public policy principle set forth in Civil Code section 4600 of favoring custody to a parent when the contest is between a marital parent and a nonparent, as enunciated in the *In re B. G.* case, supports the interpretation of Civil Code section 7017, subdivision (d), as set forth in *In re Tricia M.* and supported by me, that would favor custody to a parent as against the nonparent, even though the parent involved is an unmarried natural father of the child in question.

## II

*Civil Code Sections 7017, Subdivision (d),
and 224, in Requiring That an Unmarried Mother Must
Consent to Her Child's Adoption, but Not Requiring
That an Unmarried Father Must Consent to His Child's
Adoption, Violate the Equal Protection Clauses of Both
the Federal Constitution and the California Constitution*

The majority rejects the equal protection of the laws contention made by F.L., the unmarried father of Baby Boy G., in the case before us. The majority reasons that the California statute (the Uniform Parentage Act) avoids the fault of discriminating between *all* unmarried mothers and *all* unmarried fathers by a statutory classification which sets apart those natural fathers who have neither married the mother nor attempted marriage with the mother nor lived with the child as a parent. The classification referred to is set forth in Civil Code section 7004, subdivision (a), which creates the concept of a "presumed natural father" as either (1) a father who was married to the child's mother; (2) a father who has attempted marriage with the child's mother; or (3) a man who receives the child into his home and openly holds out the child as his natural child. Under the provisions of Civil Code section 7017, subdivision (d), the presumed natural father's consent is required for an adoption, along with the mother's consent. Civil Code section 224, in part pertinent to the issue before us, provides that "[a] child having a presumed father under subdivision (a) of Section 7004 *cannot* be adopted without the consent of its parents if living." (Italics added.) If a natural father does not meet the test of one of these three categories of a "presumed natural father," his consent is not required for an adoption of his child, and his child may be adopted upon the consent of the mother only.

As I view this statutory classification which requires, for a child's adoption, the consent of *all* unmarried natural mothers but does *not* require the consent of *all* unmarried natural fathers, it does not constitute a reasonable classification to avoid a denial of equal protection of the laws to an unmarried natural father such as F.L. in the case before us who did not fall within the category of a "presumed natural father." The provisions of Civil Code section 7017, subdivision (d), and Civil Code section 224, in providing a veto power over a child's adoption for *all* unmarried mothers but not permitting a veto power by an unmarried natural father who is not within the category of a "presumed natural father," constitute an invidious discrimination between unmarried natural fathers in the situation that F.L. finds himself and unmarried mothers which is interdicted by the constitutional guarantee of equal protection of the laws.

The rationale of the majority escapes me in its view that the Legislature had a right to conclude that all unmarried mothers are able to make an intelligent and rational decision as to what is in the best interests of their children insofar as an adoption is concerned, but that an

unmarried natural father under the circumstances presented in the case at bench is unable to make such an intelligent and rational decision. The fact that a mother gave birth to her child and, thus, by necessity, has had a connection with the child at least at the moment of birth, constitutes an insufficient basis for a classification between such mother and an unmarried natural father who does not have that opportunity for a fleeting connection with the child upon its birth.

The majority finds constitutional merit in a rule of law that would provide that an unmarried mother's fleeting connection with her child at birth—fleeting because she immediately delivers the child to nonparent persons for adoption—is entitled to a right to either consent to an adoption of her child or to veto such an adoption while the unmarried natural father of such child is given no opportunity to obtain even the fleeting connection with his child so as to become a "presumed natural father" with the same alternative right of the mother to either consent to the adoption or to veto the adoption.

The invidious nature of the classification upheld by the majority in the instant case is that the unmarried mother—who does not want the custody of her child and the responsibility which goes with such custody—is given the right to consent to an adoption of the child by non-parents and also the right to effectively preclude the unmarried father from obtaining custody and vetoing an adoption by simply frustrating all efforts of the father to obtain custody and thus put himself into a position where his consent to an adoption is required as a "presumed natural father" under the provisions of Civil Code section 7004, subdivision (a)(4). I conclude that a statutory classification—which places the unmarried mother in such a superior position to that of the unmarried natural father of their child—constitutes a compelling case of an invidious discrimination against the unmarried natural father. I am unable to find any conceivable state interest—substantial or otherwise—to justify this classification and distinction between the unmarried natural mother and the unmarried natural father that we have in the case at bench. Certainly "the best interests of the child" cannot rationally dictate such a result that is countenanced by the majority in the case before us.

The majority cites several cases of the United States Supreme Court as either supporting its holding or being distinguishable so as not to preclude its holding. One such case is that of *Quilloin* v. *Walcott* (1978) 434 U.S. 246 [54 L.Ed.2d 511, 98 S.Ct. 549]. In *Quilloin*, a Georgia

statute permitted an adoption of a child with the mother's consent and without requiring a consent by the unmarried father of the child. In *Quilloin*, the child involved was 12 years of age and had been with the mother since birth. The majority in the instant case advances the notion that the Georgia statute, which was held by the *Quilloin* court not to violate any equal protection rights of the natural father, represents a good illustration of the principle that a state may treat a father whose relationship to his child is only biological differently than it treats a father who has established a family relationship with the mother and child.

But this is an erroneous concept of the holding of *Quilloin*. The Georgia statute also provided that an unmarried father could legitimate his child by simply petitioning the trial court and asking for the legitimation of such child. By issuing an order of legitimation, such father's consent would then be required for any subsequent adoption of the child. The *Quilloin* court emphasizes that the unmarried father before the court at no time during the 11 years between the child's birth and the filing of the nonparent adoption petition, filed a petition to legitimate his child. Under the Georgia statute, had the natural father filed a petition for legitimation of his child, the mother could not have prevented such legitimation and thus could not have frustrated the desire of the father to put himself in a position to veto an adoption consented to by the mother but not consented to by him. Furthermore, the *Quilloin* court made the point that, in opposing adoption of his child 11 years later and seeking an order of legitimation, the natural father *"does not even now seek custody of his child."* (*Quilloin, supra*, 434 U.S. 246, 256 [54 L.Ed.2d 511, 520].) (Italics added.) The *Quilloin* court concluded that the Georgia statute, *"as applied in this case*, did not deprive appellant of his asserted rights under the Due Process and Equal Protection Clauses." (*Id.* at p. 256 [54 L.Ed.2d at p. 520].) (Italics added.)

It is manifest that *Quilloin* does not sustain the majority's position that Civil Code section 7017, subdivision (d), and Civil Code section 224 are not violative of the equal protection rights of F.L., the natural father in the case before us. The Georgia statute provided a method for the unmarried father to acquire the right to veto the adoption of his child by the simple process of obtaining legitimation of his child through a petition for the same. In *Quilloin*, it is significant that the adoption petition was not filed until *11* years after the child's birth. In the case at bench, the adoption proceeding was commenced within a

few days of the birth of F.L.'s child. The Georgia statute offered no opportunity for the mother to frustrate the ability of the natural father to be placed in a position where his consent to adoption of his child would be required. But under the majority's interpretation of Civil Code section 7017, subdivision (d), the unmarried father, F.L., is given no opportunity at all to obtain custody of his child similar to the Georgia statute's opportunity for a natural father to legitimate his child and thus acquire equal status with the unmarried mother to withhold a consent to adoption.

As I read *Quilloin*, with its holding that the Georgia statute was constitutional as applied to the specific factual situation presented in the case before the court, I have no doubt as to what the result would have been had the adoption there been sought within a few days after the child's birth and without any opportunity being given to the natural father to first seek and obtain legitimation of his child in order to be given the veto power over the adoption.

If the holding and views of *Quilloin* were to be applied to the provisions of the California Uniform Parentage Act and the factual situation before us, I have no doubt that such provisions could not stand constitutional scrutiny. The *Quilloin* court made this cogent and significant observation: "We have little doubt that the Due Process Clause would be offended '[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.' [Citation.] *But this is not a case in which the unwed father at any time had, or sought, actual or legal custody of his child*." (*Quilloin, supra,* 434 U.S. 246, at p. 255 [54 L.Ed.2d 511, at p. 520].) (Italics added.)

The case of *Parham v. Hughes* (1979) 441 U.S. 347 [60 L.Ed.2d 269, 99 S.Ct. 1742], relied upon by the majority, is simply inapposite to the case presented before us. A statute denying to fathers of illegitimate children the right to recover damages for the wrongful death of a child while permitting recovery by unmarried mothers provides no analogy for interpreting a California statute to provide that an adoption requires the consent of an unmarried mother of the child involved but *not* the consent of the unmarried father, and upholding the validity of the statute against a claim that it violates the unmarried father's right to equal protection of the laws.

It is to be noted that *Parham* was decided by a five-to-four divided court. Four members of the *Parham* majority reasoned that the statutory classification was rationally related to a permissible state objective of avoiding fraudulent claims of paternity after a child's death because of the inherent problem of establishing paternity. The fifth member of the majority agreed that the gender-based distinction made by the Georgia statute did not violate equal protection, but arrived at his conclusion of legality of the statute by relying on the fact that the easy method of legitimation of a child by the unmarried father, provided by the Georgia statute, enabled an unmarried father to prove his paternity and obtain the legitimation of his child during the life of the child when evidence would be more readily available. Consequently, a father who failed to legitimate his child during the child's lifetime cannot validly complain of his inability to sue for the wrongful death of that child.

The minority of the court in the *Parham* case took the view that the Georgia statute involved constituted an unconstitutional discrimination against the fathers of illegitimate children. The *Parham* minority made the cogent observation that "[t]he plain facts of the matter are that the statute conferring the right to recovery for the wrongful death of a child discriminates between unmarried mothers and unmarried fathers, and that this discrimination is but one degree greater than the statutory discrimination between married mothers and married fathers. In order to withstand scrutiny under the Equal Protection Clause, gender-based discrimination "'must serve important governmental objectives and must be substantially related to achievement of those objectives.'" [Citation.] Because none of the interests urged by the State warrant the sex discrimination in this case, I would reverse the judgment below." (*Parham, supra*, 441 U.S. 347, 362 [60 L.Ed.2d 269, 281-282] (dis. opn. of White, J.).)[1] I find the analysis and reasoning of the dissenting opinion in *Parham* to be far more compelling and persuasive than the analysis and reasoning set forth in the majority opinions.

The main reliance by F.L., the natural father in the case before us, is upon the case of *Caban v. Mohammed* (1979) 441 U.S. 380 [60

---

[1]In footnote 4, Mr. Justice White stated: "The opinion of Mr. Justice Stewart shunts aside the readily apparent classification on the basis of sex in Georgia's wrongful death scheme by stressing that appellant's child was never made legitimate, but it is only the fortuitous event of the mother's death in this case that makes legitimacy even relevant. In the case of parents of legitimate children, only the mother may sue if she is alive; the father is allowed to sue only '[i]f [there is] no mother.' Ga. Code § 105-1307 (1978). See also *infra*, at 368 [60 L.Ed.2d 281]."

L.Ed.2d 297, 99 S.Ct. 1760]. The majority seeks to distinguish *Caban* from the case at bench. The distinction is not a valid one. In my view, *Caban* is dispositive of the issue before us and mandates that the trial court's order should be upheld. In *Caban*, the New York statute which the nation's high court held could not withstand constitutional challenge on equal protection grounds, was very similar to the California statutory provisions involved in the case before us. The *Caban* court ·described the New York statute by stating that it provided that "an unwed mother has the authority under New York law to block the adoption of her child simply by withholding ·consent. The unwed father has no similar control over the fate of his child, even when his parental relationship is substantial—as in this case. He may prevent the termination of his parental rights only by showing that the best interests of the child would not permit the child's adoption by the petitioning couple." (*Caban, supra,* 441 U.S. 380, 386-387 [60 L.Ed.2d 297, 303-304].)

To determine the constitutionality of the classification made by the New York statute, the *Caban* court analyzed the classification involved by invoking the standard that "[g]ender-based distinctions 'must serve governmental objectives and must be substantially related to achievement of those objectives' in order to withstand judicial scrutiny under the Equal Protection Clause. [Citations.] The question before us, therefore, is whether the distinction in § 111 between unmarried mothers and unmarried fathers bears a substantial relation to some important state interest. Appellees assert that the distinction is justified by a fundamental difference between maternal and paternal relations—that 'a natural mother, absent special circumstances, bears a closer relationship with her child...than a father does.'" (*Caban, supra,* 441 U.S. 380, 388 [60 L.Ed.2d 297, 304-305].)

The *Caban* court rejected all arguments that were advanced to support the distinction made by the New York statute between unmarried mothers and unmarried fathers with respect to "consent" for an adoption of their children. The arguments rejected had set forth a number of factors thought to sustain the distinction as bearing a substantial relation to some important state interest. In holding that the New York statute could not withstand constitutional scrutiny, the *Caban* court stated: "In sum, we believe that § 111 [the New York statute] is another example of 'overbroad generalizations' in gender-based classifications. [Citations.] The effect of New York's classification is to discriminate against unwed fathers even when their identity is known and they have manifested a significant paternal interest in the child.

The facts of this case illustrate the harshness of classifying unwed fathers as being invariably less qualified and entitled than mothers to exercise a concerned judgment as to the fate of their children. Section 111 both excludes some loving fathers from full participation in the decision whether their children will be adopted and, at the same time, enables some alienated mothers arbitrarily to cut off the paternal rights of fathers." (*Caban, supra,* 441 U.S. 380, 394 [60 L.Ed.2d 297, 308].)

The majority in the case at bench seeks to explain the *Caban* holding by asserting that it must be read in light of the factual situation that the unmarried natural father had lived with the mother and the children and had actual custody of the children for a period of time before the commencement of the adoption proceedings. The majority concludes, therefore, that had the factual situation in *Caban* been the factual situation in the case at bench, F.L., the unmarried father before us, would have become a presumed natural father with the right to refuse his consent to the adoption of his child sought by Mr. and Mrs. J. But the majority neglects to point out that the *Caban* court did not place its holding on the ground of the special circumstances presented in that case. The *Caban* court did *not* hold that the New York statute was a violation of the equal protection clause *only* as applied to the unmarried natural father in *Caban.* The holding in *Caban,* therefore, was totally unlike the holding in *Quilloin,* in which the court concluded that the Georgia statute, as applied in the particular case, did not deprive the natural father of any asserted rights under the constitutional principles of due process and equal protection of the laws.

The majority makes reference to some dicta in a footnote to the *Caban* opinion in which the court points to the fact that there were some alternatives to the gender-based distinction of section 111 of the New York law. But in the same footnote and just prior to the sentence quoted by the majority, the *Caban* court made this observation: "In reviewing the constitutionality of statutory classifications, 'it is not the function of a court "to hypothesize independently on the desirability or feasibility of any possible alternative[s]" to the statutory scheme formulated by [the State].'" (*Caban, supra,* 441 U.S. 380, 393, fn. 13 [60 L.Ed.2d 297, 307].)

The statutory classification set forth in Civil Code section 7017, subdivision (d), and in the related Civil Code section 224, cannot be saved from constituting a violation of the equal protection rights of F.L., the unmarried natural father, on any theory that it is appropriate to

give *all* unmarried mothers the right to consent or not to consent to an adoption of their children and giving that same right to unmarried fathers who have attempted to marry the mothers or who have had the good fortune to have had custody of their children for some period of time, while denying to all other unmarried fathers any such alternative of a right to consent or not to consent to the adoption of their children. The majority would hypothesize that the California statute fully protects the unmarried father by providing him with a means of becoming a presumed natural father with the power of veto over the adoption of his child. This opportunity to gain a veto power is through the process set forth in Civil Code section 7004, subdivision (a)(4), for a natural father who "receives the child into his home and openly holds out the child as his natural child."

But this hypothesizing of opportunity, engaged in by the majority, constitutes pure fiction as applied to F.L., the natural father in the case before us. The majority does not tell us in what way F.L. was given an opportunity to obtain custody and thus take the child into his home and become a presumed natural father. On the contrary, F.L. had no opportunity to meet the requirement of Civil Code section 7004, subdivision (a)(4). By turning over her child to Mr. and Mrs. J. for adoption within a few days after the child's birth, F.L. was effectively precluded-—whether by legal means or other means—from gaining a position which would give him the same veto power over adoption of their child which the statutory provisions vest in Ms. G., the mother. Necessarily, the natural father before us is placed in a subservient position as contrasted with the right of the mother to either consent to adoption or to veto the adoption of their child.

In the return to the alternative writ, filed by F.L., the natural father of Baby Boy G. and the real party in interest before us, the evidence before the trial court is summarized as follows: F.L. testified that he and Ms. G., the mother of their child, had agreed that she would bear his child; that he would support her during pregnancy and for a period of time after birth and would support the child; that he did contribute toward the expenses of the mother's pregnancy. F.L. also testified that he and his wife, M.L., who was unable to bear children, had reconciled their differences and that she wanted his son and would love his son. M.L. also testified below that she and F.L. had reconciled their differences and that she would love Baby Boy G. notwithstanding the fact concerning his conception.

This summary of the evidence is set forth—not for any purpose of discussing the legality or illegality of the agreement between mother and father—but to indicate that F.L. sought custody of his child at the earliest opportunity presented, namely, in the adoption proceeding brought by Mr. and Mrs. J.

In *Quilloin*, it is to be noted that the natural father sought to legitimate his child in the adoption proceedings. But, in *Quilloin*, as contrasted with the instant case, the effort of the father to gain a status which would give him a power of veto of the adoption the same as the mother had, was not made until *11* years after the birth of the child and then was made without any attempt on the part of the father to secure custody of his child.

It is manifest that, under the circumstances of the case at bench, the distinction made between the unmarried mother and the unmarried father constitutes an "inflexible" gender-based distinction that is equally impermissible as that declared to be invalid in the *Caban* case.

In order for Civil Code section 7017, subdivision (d) and Civil Code section 224, to avoid the inflexible gender-based distinction proscribed by *Caban*, they must be interpreted to permit an unmarried father to have an opportunity to gain the status of a "presumed natural father" by securing custody of his child. If the first opportunity for him to gain such custody comes as a part of an adoption proceeding, filed within a few days after the birth of his child, that opportunity cannot be precluded by a trial court's determination that the best interests of the child require that he be excluded from acquiring such an opportunity, even though such a determination may be predicated in part on the fact that it is the mother's desire that neither she nor the father have any right to custody.

If Civil Code section 7017, subdivision (d), and Civil Code section 224 are not interpreted as I have suggested herein in order to validate the trial court's order granting custody of Baby Boy G. to F.L., the natural father, then Civil Code section 7017, subdivision (d), and Civil Code section 224 must meet the fate of section 111 of the New York statute as determined by *Caban* and declared to be a violation of equal protection of the laws.

There is one other alternative to save the constitutionality of Civil Code sections 7017, subdivision (d), and 224, with their inflexible

gender-based distinction between unmarried mothers and unmarried fathers. This alternative is to interpret Civil Code section 7004, subdivision (a)(4) to permit F.L., the natural father of Baby Boy G. to be considered a "presumed natural father" under the circumstances here presented. I would therefore interpret Civil Code section 7004, subdivision (a)(4), as if it read expressly: "He receives the child into his home and openly holds the child out as his natural child or seeks to do so and is prevented from doing so by the acts of the mother of said child." To save the constitutionality of a statute, this kind of interpretation, which adds or changes words of a statute, has been sanctioned by our high court. (See *In re Edgar M.* (1975) 14 Cal.3d 727 [122 Cal.Rptr. 574, 537 P.2d 406].)

Contrary to the holding of the majority, it is my view that, in making an order awarding custody of the child, Baby Boy G., to the natural father, F.L., the trial court did not err in its understanding of the law. Under a proper interpretation of Civil Code section 7017, subdivision (d), the trial court, under the circumstances presented in the instant case, was *required* to grant custody of the child to the father in order to permit him to become a "presumed natural father." I conclude that to interpret these code sections in accordance with the holding of the majority renders them constitutionally invalid in violation of F.L.'s equal protection rights under both the United States Constitution and the California Constitution.

I would deny the petition for a writ of mandate.

The petition of real party in interest for a hearing by the Supreme Court was denied March 27, 1980. Mosk, J., and Newman, J., were of the opinion that the petition should be granted.