[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 127 
OPINION
The Director of the San Diego County Department of Public Welfare, a licensed adoption agency, filed this action under Civil Code section 7017, subdivision (b) to terminate the rights of Sheldon G., the "natural father," and to secure an order that only the consent of the natural mother is required for adoption. Sheldon answered the petition and cross-complained seeking custody of Tricia. The trial court entered judgment finding Sheldon was not the presumed natural father of his child and ordered the mother's consent alone would be required for adoption. Sheldon appeals.
In December 1974 Sheldon G., then 17 years old and serving in the Marine Corps at Camp Pendleton, met Kathleen T. (Kathy) at the apartment of a friend in Oceanside. She lived with her mother in Whittier and met Sheldon on weekends in Oceanside where they had sexual relations. They never lived together as man and wife.
In February 1975 Kathy became pregnant and advised Sheldon. They continued their close personal relationship until June 1975 but he refused to marry her. He was discharged from the Marines in July 1975 and returned to his home in Philadelphia, Pennsylvania, where he sought employment. He did not ask Kathy to accompany him. Tricia M. was born in Oceanside on October 23, 1975. *Page 128 
It is conceded by all parties that Sheldon is the natural father of Tricia. Sheldon acknowledged this before the birth and has continued to do so at all times. Immediately before and for some time after Tricia's birth, Kathy lived with Jesse M., age 26, who allowed his name to be inserted on the birth certificate as father but denied he was the real father. Jesse gave his consent to the adoption and is not a party to this proceeding.
After his departure from California, Sheldon wrote Kathy a number of times and once sent some baby clothes and toys for the child. He asserts he sent her money from his unemployment check but she denied receiving it. Although he made arrangements for Kathy and the child to go to Philadelphia so they would be near him, he did not offer to marry Kathy nor did he offer to take the child from her because, he said, the child would be better off with the mother. Kathy never went to Pennsylvania.
Tricia was placed in a foster home on November 18, 1975. She was removed by the mother on December 30, 1975, but returned three days later. On January 8, 1976, she was again taken from the home and on January 12 she was returned. On February 16 Kathy again took the child. Between February 18 and 22 the child was in the hospital and on the 22d discharged to the county. On March 1, 1976, Kathy signed the papers relinquishing the child for adoption.
A county child placement and protective service worker said Kathy once told her Sheldon denied paternity and abandoned her when she was about two and one-half months pregnant. Initial inquiry with several identification agencies and a letter to Sheldon at Camp Pendleton failed to reveal Sheldon's current address. The record does not disclose why Kathy did not provide the information but when Sheldon learned of the proposed relinquishment for adoption he contacted an attorney who immediately wrote the county seeking custody of Tricia. His letter was brought to the attention of the director who initiated this action.
Sheldon has consistently taken the position he does not want to marry Kathy and if Kathy does not want to keep Tricia, he wants the child. He lives with his mother, 37, who is a teacher's assistant in Philadelphia and contends as the natural father he should be given custody. He asserts he can provide Tricia a good home. *Page 129 
The status of children born out of wedlock has been elevated in recent years both socially and legally.[1] The common law doctrine of filius nullius, the son of no one, a nonentity, has given way, though ever so slowly, to a more enlightened appreciation of the rights of individuals unfettered by the social mores of another age. In 1968 the United States Supreme Court rendered two opinions, Levy v. Louisiana, 391 U.S. 68
[20 L.Ed.2d 436, 88 S.Ct. 1509] and Glona v. AmericanGuarantee Co., 391 U.S. 73 [20 L.Ed.2d 441, 88 S.Ct. 1515], asserting illegitimate children are not nonpersons. They are humans, live and have their being. They are clearly "persons" within the meaning of the equal protection clause of the Fourteenth Amendment. The cases struck down the Louisiana wrongful death law which denied recovery by nonmarital children of the deceased mother. Children were entitled to equal protection under the law and it was wrong to discriminate against those born out of wedlock.
In 1972 the Supreme Court ventured deeper into this area inStanley v. Illinois, 405 U.S. 645 [31 L.Ed.2d 551, 92 S.Ct. 1208] which was hailed by writers as recognizing for the first time the rights of the putative father.
In Stanley the father had never married the mother of his children although they lived together intermittently and he held the children out as his own. When the mother died the children were taken from him pursuant to Illinois law and became wards of the state. The United States Supreme Court held: (1) The natural father was entitled to a hearing on his fitness as a parent before the children could be taken from him and the fact the state can apply for adoption or for custody and control of his children does not bar his attack on the dependency proceeding. The state cannot, consistently with due process requirements, merely presume that unmarried fathers in general and this petitioner in particular, are unsuitable and neglectful parents. Parental unfitness must be established on the basis of individualized proof. (2) The denial to unwed fathers of a hearing on fitness accorded to all other parents whose custody of their children is challenged by the state constitutes a denial of equal protection of the laws.
Mr. Justice White, writing for the court in Stanley set out some basic concepts in this area:
"The rights to conceive and to raise one's children have been deemed `essential,' [citation], `basic civil rights of man,' [citation], and `[r]ights far *Page 130 
more precious . . . than property rights,' [citation]. `It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' [Citation.] The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, [citation], the Equal Protection Clause of the Fourteenth Amendment, [citation], and the Ninth Amendment, [citation].
"Nor has the law refused to recognize those family relationships unlegitimized by a marriage ceremony. . . . [Citations.] `To say that the test of equal protection should be the "legal" rather than the biological relationship is to avoid the issue. For the Equal Protection Clause necessarily limits the authority of a State to draw such "legal" lines as it chooses.' [Citation.]" (Stanley v. Illinois, 405 U.S. 645, 651-652 [31 L.Ed.2d 551, 558-559, 92 S.Ct. 1208, 1212-1213].)
About this same time the United States Supreme Court reportedRothstein v. Lutheran Social Services, etc., 405 U.S. 1051
[31 L.Ed.2d 786, 92 S.Ct. 1488] returning it to the Wisconsin Supreme Court to reconsider in light of Stanley v. Illinois,supra, 405 U.S. 645. Rothstein involved a completed adoption contested by the putative father. The state court had held that relevant Wisconsin statutes grant the mother alone the power to terminate parental rights and to consent to adoption of any child born out of wedlock. The state court had held that failure to grant parental rights or notice of hearing to the putative father did not violate the equal protection clause of the Fourteenth Amendment.
It is in this light that the Commission on Uniform State Laws proposed, and California in 1975 adopted, the Uniform Parentage Act[2] (Act) and we are here called upon to review its terms as applied by the court below.
Sheldon's status as a natural father is not questioned by the director and is affirmed by the court's order.[3] The court determined on the evidence presented Sheldon was not a "presumed natural father" as *Page 131 
defined by the statute and therefore his rights of parentage had to be terminated and an appropriate order made that his consent was not required for the adoption. No other issue was put in focus and the court specifically rejected the contention it had before it a question which would relate to custody or what was in the best interests of the child.
The Act provides the "parent and child relationship" means the legal relationship existing between a child and his natural or adoptive parents incident to which the law confers or imposes certain rights, privileges, duties and obligations (Civ. Code, § 7001). It is significant the Legislature then affirmed the parent and child relationship extends equally to every child and to every parent regardless of the marital status of the parties and at the same time it abolished the incidents of illegitimacy under the older law (Civ. Code, § 200 et seq.). The Act then sets out the method of legally establishing the existence of a parent and child relationship (Civ. Code, § 7003).
The Act creates certain rebuttable presumptions to support proof the man is the natural father of a child.
"§ 7004. (a) A man is presumed to be the natural father of a child if he meets the conditions as set forth in Section 621 of the Evidence Code or in any of the following subdivisions:
"(1) He and the child's natural mother are or have been married to each other and the child is born during the marriage, or within 300 days after the marriage is terminated by death, annulment, declaration of invalidity, or divorce, or after a decree of separation is entered by a court.
"(2) Before the child's birth, he and the child's natural mother have attempted to marry each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and,
"(i) If the attempted marriage could be declared invalid only by a court, the child is born during the attempted marriage, or within 300 days after its termination by death, annulment, declaration of invalidity, or divorce; or
"(ii) If the attempted marriage is invalid without a court order, the child is born within 300 days after the termination of cohabitation. *Page 132 
"(3) After the child's birth, he and the child's natural mother have married, or attempted to marry, each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and
"(i) With his consent, he is named as the child's father on the child's birth certificate, or
"(ii) He is obligated to support the child under a written voluntary promise or by court order.
"(4) He receives the child into his home and openly holds out the child as his natural child.
"(b) Except as provided in Section 621 of the Evidence Code, a presumption under this section is a rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence. If two or more presumptions arise under this section which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls. The presumption is rebutted by a court decree establishing paternity of the child by another man."
Thus, in order to come within one of the section 7004, subdivision (a) presumptions numbered 1, 2 and 3 the man seeking to establish himself as a presumed natural parent is required to prove a marriage or an attempted marriage. Only presumption number 4 applies to the man who cannot produce evidence of some real or attempted marriage relationship. These are presumptions, none of which is conclusive, and it is apparent natural parentage can be established without resort to any presumption.
In the instant case the parties agree Sheldon is the natural father of Tricia so resort to a presumption is not required to establish parenthood. The Act, however, makes a distinction between "natural father" and "presumed father" for other purposes. These are words of art and must be differentiated particularly in adoption cases under section 7017 (1) In an adoption matter an effort must be made to identify the natural father and give him notice and an opportunity for a hearing on custody and the determination of his status as a "presumed . . . father" as the phrase is defined in section 7004, subdivision (a) before a court issues an order stating the mother's consent alone is required to complete the *Page 133 
adoption. This procedure complies with the due process and equal protection requirements of Stanley v. Illinois, supra,405 U.S. 645.
Civil Code section 7017, subdivisions (c) and (d) reads as follows:
"(c) In an effort to identify the natural father, the court shall cause inquiry to be made by the State Department of Health, a licensed county adoption agency, or the licensed adoption agency to which the child is to be relinquished of the mother and any other appropriate person. The inquiry shall include the following: whether the mother was married at the time of conception of the child or at any time thereafter; whether the mother was cohabiting with a man at the time of conception or birth of the child; whether the mother has received support payments or promises of support with respect to the child or in connection with her pregnancy; or whether any man has formally or informally acknowledged or declared his possible paternity of the child. The department or the licensed adoption agency shall report the findings to the court.
"(d) If, after the inquiry, the natural father is identified to the satisfaction of the court, or if more than one man is identified as a possible father, each shall be given notice of the proceeding in accordance with subdivision (f). If any of them fails to appear or, if appearing, fails to claim custodial rights, his parental rights with reference to the child shall be terminated. If the natural father or a man representing himself to be the natural father, claims custodial rights, the court shall proceed to determine parentage and custodial rights in whatever order the court deems proper. If the court finds that the man representing himself to be the natural father is a presumed father under subdivision (a) of Section 7004, then the court shall issue an order providing that the father's consent shall be required for an adoption of the child. In all other cases, the court shall issue an order providing that only the mother's consent shall be required for the adoption of the child."
Keeping in mind the distinction between the "natural father" and the "presumed father" we turn first to the sentence, "If the natural father or a man representing himself to be the natural father, claims custodial rights, the court shall proceed to determine parentage[4] and custodial rights in whatever order the court deems proper." It is apparent the Legislature intended in adoption cases to give the court authority to *Page 134 
consider custody before reaching an ultimate conclusion of parentage. The reason for this discretion becomes apparent when one considers the concern so often expressed by the writers in this field that a natural father worthy of and desiring custody but who resists marriage may be blocked in his efforts to obtain custody just because the mother refuses to permit him the opportunity to have the child in his family. By the same token the natural father who has shown no previous interest in providing a family atmosphere for his child should not be allowed to withhold consent and block a speedy adoption which would be in the child's best interests unless he can show his action will now result in a custodial arrangement serving the best interests of the child.
The resolution of this quandary is to be found in the next sentence of the section. The language then in effect provides only the "presumed father," namely one who has married the mother, attempted to effect a marriage or received the child into his home and openly held the child out as his own natural child, has done enough more than simply provide genesis for the child to warrant right to withhold consent to an adoption. In such a case the burden shifts to the person seeking to take custody from him and requires proof of some conduct on his part justifying termination of his parental rights.[5] Where the mother has frustrated the natural father's efforts to hold the child out as his, the court may, in a proper case, first grant him custody, allow him to complete the conduct necessary under section 7004, subdivision (a) (4) to establish himself as a presumed father, and then make the appropriate order.
A discussion of this problem can be found in a well written article in 28 Hastings L.J. (1976) 191, 217-218, 221-222:
". . . a narrow application of the statute could potentially leave the unwed father who has not become a presumed father under section 7004(a) in virtually the same unfavorable position he occupied before enactment of the Uniform Act. However, the statute does afford the courts a method of alleviating the problem where justice requires. As pointed out, the court has the power to determine parentage and *Page 135 
custodial rights in whatever order it deems proper. Therefore, to protect the rights of the unwed father who can demonstrate both his paternity and his fitness to assume custody, the court may award custody to him. This would allow him to accomplish legitimation under section 7004(a)(4) and render him a presumed father. His consent would then be required before his child could be released for adoption.
". . . . . . . . . . . . . . . . . . .
"Under the procedural provisions of the new Civil Code section 7006, a putative father's consent to adoption of his child is required only if he can establish that he is a presumed father — i.e., that he is or was married to the child's mother or that he has `legitimated' the child by acknowledging it and accepting it into his home. To avoid foreclosing the rights of putative fathers who have not been able to become `presumed' fathers, but who are nevertheless fit to assume custody, the court may determine custodial rights prior to deciding the issue of parentage. By awarding custody to the putative father, the court can allow him to legitimate the child, thus equalizing his rights in the adoption procedure with those of the child's mother.
"The importance of the adoption system in providing secure and loving home environments for children whose natural parents cannot or do not wish to raise them is obvious. However, in our rush to insure the stability and efficiency of the adoption process, it is apparent that the rights of the parties involved — particularly the unwed father — may well suffer. It may be instructive in this regard to consider the growing awareness of adopted children who have undertaken to search for their `real' parents in an attempt to discover their familial roots. Would it not be fairer to all of the parties in an adoption proceeding to ensure that the rights of the putative father who wants to assume custody of his child and is adjudged qualified to do so are protected? After all, it makes no more sense to insist that all unwed fathers are disinterested and unfit parents than it does to continue in the belief that all mothers are by nature interested in raising children.
"It is to be hoped that courts will weigh these considerations in determining adoptions issues." (28 Hastings L.J. 217-218, 221-222.)
The concept was reiterated in Adoption of Rebecca B.,68 Cal.App.3d 193, 198, footnote 4 [137 Cal.Rptr. 100]: "Under the Uniform Parentage *Page 136 
Act (§ 7000 et seq.; Stats. 1975, ch. 1244, § 11, effective Jan. 1, 1976), a man not the presumed father of a child under section 7004, subdivision (a), but alleging himself to be the father, may bring an action to determine the existence of the father and child relationship (§ 7006, subd. (c)). The resulting judgment or order of court may make provision for any matter in the best interests of the child including support, custody, guardianship and visitation privileges (§ 7010, subd. (c)). Thus the judgmentmay provide the opportunity for the alleged natural father toqualify as the presumed father under section 7004, subdivision(a)(4). Section 7017 spells out the rights of a presumed father with respect to a child in the situation where the mother `relinquishes or consents to or proposes to relinquish [the child] for adoption. . . .'" (Italics added.)
Under these conditions we observe full compliance withStanley v. Illinois, supra, 405 U.S. 645, both as to due process as well as equal protection.
(2) In the instant case custody was sought by Sheldon and it is apparent from the record he was foreclosed from offering evidence on that issue.[6] In a petition to set aside the judgment the matter of custody and the best interests of the child were specifically raised by Sheldon for a second time and rejected as inappropriate by the trial court.[7] The *Page 137 
matter of custody was a proper subject for the court to consider[8] and it was error to limit the consideration to whether this natural father was at that time a "presumed father" as defined. If Sheldon is found to be a proper person to have custody of the child, he could then qualify himself as the "presumed father" before the proceeding was completed and appropriate orders made. If not, the issues could then be fully resolved as the court did in this case.
We find no reason to discuss at this time the law applicable to custody proceedings except to cite Civil Code section 4600 and relevant case law, more specifically In re Richard M.,14 Cal.3d 783 [122 Cal.Rptr. 531, 537 P.2d 363]; In re Rebecca B.,supra, 68 Cal.App.3d 193; and In re Reyna, 55 Cal.App.3d 288
[126 Cal.Rptr. 138].
Judgment reversed with directions to the trial court to hold further hearings consistent with this opinion.
Brown (Gerald), P.J., and Rosado, J.,* concurred.
Respondent's petition for a hearing by the Supreme Court was denied December 15, 1977.
[1] See generally Krause, Illegitimacy, Law and Social Policy (1971).
[2] The state law (Civ. Code, § 7000 et seq.) does not correspond exactly to the commission's recommendation. See Krause, The Uniform Parentage Act, 8 Fam. L.Q., I, 14 et seq., for discussion of the uniform act draft.
[3] The court's order recites, "IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the rights of Sheldon . . . to his child, Tricia Marie M., are terminated and that only the mother's consent shall be required for the adoption of said minor." (Italics added.)
[4] The word parentage here can only be interpreted as referring to whether the person holds either the status of natural father or the status of presumed father.
[5] Civil Code section 197 confers on a presumed father a right to custody equal in stature to the custodial right of the mother. Section 197 provides: "The mother of an unmarried minor child is entitled to its custody, services and earnings. The father of the child, if presumed to be the father under subdivision (a) of Section 7004, is equally entitled to the custody, services and earnings of the unmarried minor. If either the father or mother be dead or unable or refuse to take the custody or has abandoned his or her family, the other is entitled to its custody, services and earnings."
[6] No evidence was received on the issue of custody. At the first hearing the court made the following observation:
"THE COURT: That's right. When you say his consent, his consent is not required for adoption, then what you're actually saying is, he's not entitled to any right as far as that child is concerned, custodial or otherwise.
"MR. LANDERS: That's the way it appears, but it certainly isn't right.
"THE COURT: I disagree with that. As I say, I think there's something a little bit shaky in the logic where you have facts, marginal facts, if you want to put it that way — at least where a man says, I have tried to do this, tried to do that, I could have put myself into a presumed situation but I was prevented from doing so — that is the area which makes it an injustice, really, but I don't think it has been taken care of in the statute.
"I think we can agree on the facts. There's no question about the facts and I'm assuming now for the sake of your appeal — and I hope you do — that this man is the natural father — he has stated so under oath — that this man has attempted to contact the natural mother from time to time, that this man did take steps to go before the authorities in Philadelphia to see if he could obtain rights, thinking that the natural father had the right. I still don't think any of those things bring him within 7004(a) which makes me rule as I'm ruling. Do you see what I mean?"
[7] In the second hearing the court said:
"THE COURT: The fact that bothered me and I think bothered counsel at the time was the word `presumed' in there. We are talking about an actual natural father. By his own statement he stated he was the natural father and there was nothing to indicate otherwise. So the question arises as to whether or not we have to give any consideration to the word `presumed.' What are the rights of a natural father?
". . . . . . . . . . . . . . . . . . . . .
"THE COURT: I don't think the matter of the best interests of the child is before me. The question is whether or not the presumed natural father is entitled to certain rights, that's all, and we don't look at what is to the best interest in this proceeding, as I recall it. It may well be when we get to an adoption or some other proceedings, then I may have to see whether or not the best interests of the child are to be considered in terms of whether it should be adopted or not adopted, et cetera. This is the first move. . . ."
[8] The clear language of Civil Code section 7017, subdivision (d) requires the court to determine custodial rights in this proceeding when claimed. This may not be an exclusive remedy but it is a right available to him in addition to any other procedures (see e.g. § 7006, subd. (c)).
* Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council. *Page 138