[No. B002775. Second Dist., Div. One. Aug. 13, 1984.]

Adoption of BABY BOY D., a Minor.
BETH D. et al., Plaintiffs and Respondents, v.
STEVEN A., Defendant and Appellant.

COUNSEL

Peter J. Ray, under appointment by the Court of Appeal, for Defendant and Appellant.

James Anthony Kelly for Plaintiffs and Respondents.

OPINION

SPENCER, P. J.—

### INTRODUCTION

Steven A. appeals from an order terminating his parental rights and requiring only the consent of the natural mother, Beth D., for the adoption of Baby Boy D.

On July 6, 1982, Mr. and Mrs. D. filed an amended petition for the adoption of Baby Boy D., alleging that the consent of the natural mother alone was required for the adoption, in that there was no presumed father as defined in Civil Code section 7004, subdivision (a), and that the natural mother was prepared to give her consent. The County of Los Angeles Department of Adoptions reported that the natural mother, Beth D., stated by telephone on June 18, 1982, that she did not wish to give her consent to the adoption until the natural father's rights were terminated; she named Steven A. as the natural father.

Consequently, a hearing was held on January 31, 1983, to determine whether Steven's rights should be terminated; at that time, Steven sought custody of Baby Boy D. The superior court found that Steven was the biological father of Baby Boy D. (an issue never in dispute), that he did not

qualify as a presumed father within the meaning of Civil Code section 7004, subdivision (a) and therefore, that his consent to the adoption was not required and his rights should be terminated. The court did not rule on Steven's custody request.

### STATEMENT OF FACTS

Beth and Steven enjoyed a close relationship in the environs of Boston, Massachusetts dating from the fall of 1980. By the spring of 1981, they had discussed marriage; ultimately, Beth agreed to marry Steven. However, by late spring, she began to have doubts about the wisdom of the marriage. Notwithstanding those doubts, Beth decided to go ahead with the marriage when she learned she was pregnant. She told Steven of her pregnancy during the third week of June 1981. Steven's initial reaction was to refuse any assistance with the financial burdens of the pregnancy. He told Beth he "wasn't going to pay for any hospital bills because the state would pay for it any way." He indicated he would not pay any of the bills even if they did marry. Steven suggested Beth seek welfare and visit a free clinic in a "rough" neighborhood of Boston.

Plans went ahead for a wedding in the first week of August. A couple of weeks before the wedding date, Beth visited Steven's home to discuss wedding plans. At the time, Steven had $80 in cash, but the couple had not purchased anything for the baby or acquired an apartment. Suddenly, Steven became very angry; he said Beth was "stupid and ignorant"; "you stupid women can't do anything." He then stalked out and gambled away the $80. After Steven left, his mother said, "Beth, if I were you I wouldn't put up with this. I know how he is treating you. I would leave him." Beth again considered the wisdom of marrying Steven and shortly thereafter, she concluded it would be worse to marry him than to have the baby alone. She stated, "I was afraid for the child and to have to bring up the child with him as a father."

Steven was prone to fits of temper. At one point, he told Beth he no longer wanted to marry her, so she could get an abortion. On one occasion, he expressed a fleeting doubt whether he was the father of the child she was carrying. When in a state of temper, Steven tended to scream and yell; Beth considered his conduct very childish.

In addition, Steven displayed considerable hostility to authority; he lied to his employer regarding the hours he actually worked as opposed to the hours he was clocked in to work and frequently talked about receiving welfare. On more than one occasion, when working as a security guard, Steven had accepted bribes to give certain people privileged treatment. His work

history was erratic; he seemed unable to hold a job. Beth was "afraid that he could not support me or a child"; she considered Steven very unstable emotionally.

On occasion, Steven also engaged in bizarre behavior. Sometimes after seeing a movie, he would vicariously live the life of the main character. Once, he walked through Boston Commons with a friend who recently had been released from a mental hospital, introducing himself as "Mr. Fornication" while the friend introduced himself as "Jim Jones." Steven thought this was uproariously funny.

Steven gambled very heavily, at the race track and through "bookies." He sometimes lost substantial sums of money. On occasion, he had stolen money from Beth for the purpose of gambling.

After Beth decided not to marry Steven, she returned home to her parents in Lancaster, Pennsylvania. Steven also left the Boston area in August 1981. In mid-September, Beth accepted an offer of a home in California with a couple suggested by friends. When she left for California, she did so without informing Steven of her destination; she also instructed her parents not to tell him her whereabouts, because she was afraid of him. He had indicated that he or his family had some connection with organized crime. "He made a lot of threats to me . . . . All kinds of things, that he would find me, and that he would make me suffer for leaving him, and that what I did was terrible. . . . He would get the Mafia on my family . . . [to] kill us."

Threats were also directed to Beth's father, George D., who related that Steven called frequently with threats, but seldom asked about Beth's well-being. Steven told Mr. D., "[I]f things did not go his way, that he would call the Mafia in and take care of our lives, Beth's life, whoever was necessary. . . ."

Steven continued to call Beth's family after her departure for California. Occasionally, he wrote her letters in care of her parents, which they then forwarded to Beth. In response to one letter, which revealed how upset Steven was, Beth telephoned him in November 1982. As they talked, Beth attempted to explain her actions in cancelling the marriage, breaking off with Steven and leaving the East; however, she did not tell him where she was.

About the same time, Steven attempted to set up a "marital arbitration" through a church in Panorama City, California. After Beth was notified of this, she contacted an attorney affiliated with the church and agreed. The attorney attempted several times to contact Steven and Beth also tried once;

none of the efforts succeeded and the planned arbitration came to nothing. Beth had no further direct contact with Steven until she returned to Pennsylvania.

On February 24, 1982, Beth gave birth to a boy in Ontario, California. She previously had arranged for an independent adoption and had met the prospective adoptive parents, Mr. and Mrs. D.; she was not pressured into deciding on adoption. On February 26, Beth signed a release authorizing the hospital to deliver Baby Boy D. to the custody of Mr. and Mrs. D. The child has been in the D.s' physical custody ever since.

Soon after giving birth, Beth returned to her parents' home in Pennsylvania. She received a telephone call from Steven on March 8, 1982, at which time he learned of the birth of his son. During the call, Steven threatened to publish "this whole thing in the Star and the National Enquirer. . . . He threatened to walk into our church and just broadcast it to everybody and tell them how terrible [my] family was." Steven also threatened to go to her uncle's home in Maine and tell Beth's relatives. From that point on, her parents' home received numerous telephone calls in the middle of the night; there never was anyone on the line—the caller just hung up. On one occasion, Beth's mother thought she heard a sound identifiable as Steven.

Following Beth's return to Pennsylvania, she and her family had frequent contact with Steven by telephone. He consistently expressed his opposition to the adoption of his son. On occasion, he made alternative suggestions to Beth. Once, he proposed that she have some local family raise the baby so that he could see his son occasionally. On another occasion, Steven said he planned to ask Bob Hope for money with which to pursue this case. At yet another time, Steven told Beth, "Well, I don't really care anyway. I just want to prove my point, and I would probably give the baby back to the [D.s'] anyway."

Steven and Beth never lived together during their relationship; Steven's name does not appear on Baby Boy D.'s birth certificate. Although Steven did write once, saying he would help financially with the pregnancy, Beth never received any money from him. He never succeeded in finding out where she was staying in California. Beth acknowledged that, despite Steven's propensity for fits of temper, she had never known him to become physically violent. However, his threats after their breakup genuinely frightened her.

Steven maintained that he wanted to marry Beth when she became pregnant and told her then he wanted the child. He admitted having brief doubts

at one time that the child Beth was carrying was his, but insisted he "basically knew it was." Steven never changed his mind about marrying Beth, but she was constantly changing her mind about marriage. After she left Pennsylvania, he contacted her family many times in an attempt to locate her.

Steven denied much of the conduct Beth ascribed to him, but acknowledged "She might have been a little afraid [of me]." She told him she wanted to keep him from getting custody of the baby, but he was certain his son would be better off with him because he, as the father, could love the baby more than adoptive parents. Steven intended to care for his son in his parents' home. He explained that he had dropped the plans for an arbitration and not paid any support to Beth because she had already decided to place the baby for adoption.

Steven's counsel attempted to call Steven's mother as a witness to his ability to care for the child properly and further attempted to examine respondents as to their fitness to have custody. However, the court refused to hear any further evidence whatsoever.

## CONTENTS

### I

Steven contends that due process and equal protection of the laws, as guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution, require that his parental rights not be terminated nor custody of his child be awarded to a nonparent except upon a finding it would be detrimental to the child to award custody to the natural parent.

### II

Steven further contends that application of the "presumed father" classification established by Civil Code section 7004, subdivision (a) to determine the necessity for a father's consent (Civ. Code, § 7017, subd. (d)) in circumstances where the natural mother has prevented the natural father from qualifying as a statutory presumed father is constitutionally impermissible, in that it creates an overbroad gender-based discrimination.

### III

Steven asserts he was deprived of procedural due process of law when the superior court refused to expand the scope of the instant hearing to

encompass a full evidentiary examination of the competing claims for custody.

DISCUSSION

I

 Steven contends that due process and equal protection of the laws, as guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution, require that his parental rights not be terminated nor custody of his child be awarded to a nonparent except upon a finding it would be detrimental to the child to award custody to the natural parent. We agree.

 The United States Supreme Court has recognized parental rights as fundamental in nature and paramount in importance, stating: "The rights to conceive and to raise one's children have been deemed 'essential' [citation], 'basic civil rights of man' [citation] and '[r]ights far more precious . . . than property rights' [citation]. 'It is cardinal with us that the custody, care and nurture of the child reside *first* in the parents . . . .'" (*Stanley* v. *Illinois* (1972) 405 U.S. 645, 651 [31 L.Ed.2d 551, 558, 92 S.Ct. 1208], italics added.) In deference to this principle, California follows the doctrine of parental preference.

 Civil Code section 4600, subdivision (c), currently expresses the doctrine as follows: "Before the court makes any order awarding custody to a person or persons other than a parent, without the consent of the parents, it shall make a finding that an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interests of the child." The doctrine as expressed in section 4600 is not limited in application to dissolution proceedings, but extends to "any proceeding where there is at issue the custody of a minor child" (§ 4600, subd. (a)), thereby meeting the need for a uniform standard. (*In re B. G.* (1974) 11 Cal.3d 679, 696 [114 Cal.Rptr. 444, 523 P.2d 244].) Stated otherwise, "a court *must* award physical custody of a minor to a parent, if fit to exercise custody, as against a stranger." (*Id.*, at pp. 693-694, italics added.) The doctrine, if applicable to the instant proceeding, thus accords fully with the constitutional requirements of *Stanley* v. *Illinois, supra,* 405 U.S. 645.

 Since it is established that a section 7017 proceeding in which the natural father claims custodial rights is a proceeding which places in issue the custody of the child (see *W. E. J.* v. *Superior Court* (1979) 100 Cal.App.3d 303, 311 [160 Cal.Rptr. 862]; *In re Tricia M.* (1977) 74 Cal.App.3d 125, 136-137 [141 Cal.Rptr. 554]), it appears the doctrine is

applicable to this proceeding. However, *W. E. J.* v. *Superior Court, supra,* 100 Cal.App.3d 303 takes the view that the doctrine of parental preference does not and need not apply. While acknowledging that *In re B. G., supra,* 11 Cal.3d 679 may not be distinguished on the basis of the procedural setting for the custody claim (*W.E.J.* v. *Superior Court, supra,* at p. 312), *W. E. J.* attempts to draw a distinction based on "the relationships between the child and the respective claimants." The court notes "*In re B. G.* was a contest for the custody of marital children, whom the mother had never abandoned, as between the mother and a court-selected foster home. In our case the choice is between a proposed adoption into a family selected by the mother and a father who has established neither a marital or family relationship with the mother and child. Our case is governed by a statute [Civ. Code, § 7017] which provides that such a father may be heard with respect to the proposed adoption but may not control it.

"The new provision of section 7017, subdivision (d) [requiring the father's consent to the adoption only if the court finds he is a presumed father under subd. (a) of § 7004], reflects the Legislature's intent to give greater protection to the child's interests as opposed to the preferences of a purely biological father. In the context of this case the court is not compelled to deliver custody to a biological father who is otherwise a total stranger, solely upon the judicial prediction that the new custody will not be harmful.

"If the court proceeds with the adoption, the question of custody becomes moot. The purpose and effect of section 7017 is to allow the court to act for the best interests of the child in this kind of contest." (*Ibid.*)

The attempted distinction will not withstand close scrutiny. *W. E. J.* v. *Superior Court, supra,* 100 Cal.App.3d 303 acknowledges that a natural father who is not a presumed father has a right to seek custody of his child within the context of a Civil Code section 7017 hearing and, when sought, the court is required to make a decision on custody. (*Id.,* at p. 311; accord *In re Tricia M., supra,* 74 Cal.App.3d 125, 137.) Of course, in making a custody determination, the court is to act in the best interests of the child—in full compatibility with Civil Code section 4600. Section 4600 clearly intends to encourage and facilitate court decisions in the best interests of the child, requiring not only a finding that an award of custody to the parent is detrimental to the child, but a finding that an award of custody to the nonparent is in the best interests of the child. (§ 4600, subd. (c).) But subdivision (d) of Civil Code section 7017[1] distinguishes between

---

[1]Civil Code section 7017, subdivision (d), provides in pertinent part: "If, after the inquiry, the natural father is identified to the satisfaction of the court, . . . [he] shall be given notice of the proceeding . . . . If [he] fails to appear or, if appearing, fails to claim custodial rights, his parental rights with reference to the child shall be terminated. If the natural father . . . claims custodial rights, the court shall proceed to determine parentage and custodial

a statutory presumed father and any other natural father only on the basis of whose consent shall be required for the adoption, not on the basis of what standard shall apply in determining custody claims. Only if a natural father who is not a statutory presumed father is considered a nonparent may the court weigh the best interests of the child without determining first the issue of detriment. (*In re B. G., supra,* 11 Cal.3d 679.)

■ Established California law does not narrowly define the term "parent." *In re Lisa R.* (1975) 13 Cal.3d 636 [119 Cal.Rptr. 475, 532 P.2d 123, 90 A.L.R.3d 1017] considered the issues of whether the juvenile court had jurisdiction to determine the parentage of a minor and whether an alleged natural father can offer proof of parentage notwithstanding the apparent preclusion in the statutory presumption of former Evidence Code section 661 (repealed by Stats. 1975, ch. 1244, § 14, p. 3202 [as part of the parentage act]). In a footnote, the Supreme Court addressed the alleged father's standing to prove paternity, noting that paternity was in issue because he sought a modification of his daughter's dependency status, a right afforded to a "parent" by Welfare and Institutions Code section 778. This afforded him standing. (*In re Lisa R., supra,* at p. 644, fn. 9.)

*Lisa R.* presented no question of parental rights emanating from the legitimation of a child; the alleged father had visited his daughter only a handful of times during her lifetime and had not seen her at all in the preceding two years. Nevertheless, the court found sufficient room in the concept of "parent" to permit him to intervene in his child's interests, holding that the juvenile court indeed had jurisdiction to determine parentage in such a situation and that the father must be permitted to offer proof on the issue, notwithstanding the presumption in former Evidence Code section 661. (13 Cal.3d at pp. 644, 651.)

In addressing the latter issue, the court gave considerable attention to *Stanley* v. *Illinois, supra,* 405 U.S. 645, noting two points of pertinence. First, although the unwed father in *Stanley* had physical custody of the children when the mother died, "the court purported to go beyond the precise facts of that case and held that the state was required to afford a hearing to all unwed fathers who desire and claim that they are fit to care for their children when the mother cannot or will not provide that care. [Citations.]" (*In re Lisa R., supra,* 13 Cal.3d at pp. 647-648.) Second, summarizing *Stanley, Lisa R.* notes, "In broad terms *Stanley* states that the interest of an

---

rights in whatever order the court deems proper. If the court finds that the man representing himself to be a natural father is a presumed father under subdivision (a) of Section 7004, then the court shall issue an order providing that the father's consent shall be required for an adoption of the child. In all other cases, the court shall issue an order providing that only the mother's consent shall be required . . . ."

unwed father in his children is not only cognizable but also of sufficient substance to warrant deference except when the deprivation comports with equal protection and due process requirements." (*Ibid.*)

Both before and since the passage of the Parentage Act (Stats. 1975, ch. 1244), intermediate courts have followed the lead of *Lisa R.* in broadly defining the term "parent" when custody is at issue. Under prior law, utilizing the concepts of legitimate and illegitimate children, a natural father could legitimate a child born out of wedlock by the same means which will now classify him as a statutory presumed father. (See former Civ. Code, § 230, repealed by Stats. 1975, ch. 1244, § 8, p. 3196 [legitimation by marriage of parents]; § 195, repealed by Stats. 1975, ch. 1244, § 1, p. 3195 [issue of void, invalid, annulled or dissolved marriage legitimate]; and Evid. Code, § 661, repealed by Stats. 1975, ch. 1244, § 14, p. 3202 [child born during marriage or within 300 days of dissolution presumed legitimate].) If a father failed or was precluded from legitimating the child, only the mother was entitled to its custody, services and earnings. (Former Civ. Code, § 200, repealed by Stats. 1975, ch. 1244, § 4, p. 3195.) Accordingly, only the mother's consent was required for the adoption of an illegitimate child. (Civ. Code, § 224 [before its amendment by Stats. 1975, ch. 1244, § 7, p. 3195].)

Interpreting this body of law, *In re Reyna* (1976) 55 Cal.App.3d 288 [126 Cal.Rptr. 138] held that the natural father of an illegitimate child could seek custody even though he was not entitled thereto by statute and, for purposes of a custody proceeding, he was a "parent" within the meaning of Civil Code section 4600. "[E]ven if it is determined that David has not legitimated his child and even assuming that the statutory procedures for relinquishment of the child by the mother have been complied with, he nonetheless will be entitled to custody under the parental preference doctrine set forth in section 4600 unless the agency meets its burden of proving that an award to David would be harmful to the child." (*In re Reyna, supra,* at p. 297.) Relying on *In re Lisa R., supra,* 13 Cal.3d 636 and *Stanley* v. *Illinois, supra,* 405 U.S. 645, the court continued, "Because recent cases define the parental preference rule as arising from the natural relationship between a parent and child rather than the legal relationship . . ., we construe the word 'parent' as used in section 4600 to include the father of an illegitimate child." (*In re Reyna, supra,* at p. 297.)

█ *Adoption of Rebecca B.* (1977) 68 Cal.App.3d 193 [137 Cal.Rptr. 100] expressly recognized that the parentage act, while removing all references to legitimacy or illegitimacy, has retained the substance of the prior law on those subjects. Looking to the interpretation of *Stanley* v. *Illinois, supra,* 405 U.S. 645 in *In re Lisa R., supra,* 13 Cal.3d 636, *Rebecca B.*

held that a natural father, although not a presumed father or one who has legitimated his child, nonetheless is a "parent" with rights under Civil Code section 4600. (*Rebecca B., supra,* at p. 199.) In *Rebecca B.,* the adoption sought was a stepparent adoption, in which the mother actually retained both legal and physical custody of the child. Accordingly, the court recognized an absence of right in the father to interfere with the proposed adoption, "[b]ut if for any reason the adoption proceedings are abandoned . . . , or the petition is denied, the natural father retains the custodial preference accorded a parent by section 4600." (*Ibid.*)

Given the substantive identity of the law relating to legitimacy and its replacement in the parentage act, the foregoing cases have lost none of their precedential value. Hence, we are compelled to reject the distinction *W. E. J.* v. *Superior Court, supra,* 100 Cal.App.3d 303 attempts to draw between children of a marital or "presumed" (i.e., formerly legitimate) relationship and the offspring of a "natural" (i.e., formerly illegitimate) relationship.

We note that imposition of the dual standard of detriment and best interests set forth in section 4600 to a natural father's claim of custodial rights in a section 7017 hearing does not have the effect of giving the father a "power to veto an adoption which the mother and court might find to be in the best interest of the child"—the concern which motivated the court in *W. E. J., supra,* 100 Cal.App.3d 303, 314. To the contrary, it simply injects into a section 7017 custody proceeding the necessary uniform standard which, in this instance, is the natural father's sole practical opportunity to establish himself as a parent. The doctrine of parental preference in custody matters is an established right of constitutional magnitude. Application of the section 4600 standard to section 7017 proceedings serves to facilitate the protection of the right.

Respondents argue, however, that even if Steven is entitled to the protection of the parental preference doctrine as expressed in Civil Code section 4600, no finding of detriment was required in the instant proceeding to deny Steven custody. They point out that Beth may have relinquished physical custody of her child, but retains legal custody; they rely on her failure to sign the consent to the adoption. We note initially that, had Beth *signed* the consent, since this is an independent adoption, she nonetheless would have retained legal custody. (*In re Adoption of Schroetter* (1968) 261 Cal.App.2d 365, 371 [67 Cal.Rptr. 819].) However, for the instant custody contest to have the character of competing parental claims, Beth must *assert* her right to custody. (Cf. *Guardianship of Pankey* (1974) 38 Cal.App.3d 919, 933 [113 Cal.Rptr. 858].) She has yet to do so expressly and unequivocally.

Beth signed a release authorizing the delivery of Baby Boy D. to the custody of the respondents. She immediately returned to Pennsylvania and did not contact respondents for several months to inquire about the infant's welfare. She undertook these acts with the intent to sever her parental relationship to the child and to facilitate his adoption by respondents. She has not wavered in that intent, but still favors the adoption. These facts are sufficient to support a finding of abandonment, had such a finding been sought. (*Id.*, at p. 932.)

Beth did testify that her opposition to Steven's custody claim is so strong, she wants the child before permitting custody to go to Steven. In other words, she would assert her legal right to physical custody only to thwart Steven's goals. While this testimony would support a finding she had asserted a contingent claim to custody, no such finding was made and the proceeding below was not conducted in that posture. Unless and until Beth unmistakably asserts her right to custody, Steven's claim must be considered to be in opposition to respondents' claim, i.e., a parent versus nonparent contest in which the court is required to find detriment in order to deny Steven custody. (*In re B. G., supra,* 11 Cal.3d 679, 698-699.)

In sum, we hold Steven's rights to due process of law, as guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution, mandate the application of the parental preference doctrine to the instant proceeding. (*Stanley* v. *Illinois, supra,* 405 U.S. 645, 657 [31 L.Ed.2d 551, 562]; *In re Lisa R., supra,* 13 Cal.3d 636, 647-648.) So long as Beth does not assert her mother's right to physical custody, Steven may not be denied custody of his child or have his parental rights terminated except upon a finding that leaving custody with respondents is necessary to avert harm to the child.

## II

Steven further contends that application of the "presumed father" classification established by Civil Code section 7004, subdivision (a), to determine the necessity for a father's consent (Civ. Code, § 7017, subd. (d)) in circumstances where the natural mother has prevented the natural father from qualifying as a statutory presumed father, is constitutionally impermissible in that it operates to create an overbroad gender-based discrimination. Viewing the statutory scheme embodied in Civil Code sections 224 [governing necessity for consent to adoption], 7004 and 7017 solely as it operates when a natural father seeks custody of his child, we cannot agree.

*Caban* v. *Mohammed* (1979) 441 U.S. 380 [60 L.Ed.2d 297, 99 S.Ct. 1760] invalidated on the ground of gender-based overbreadth a New York

statute which permitted an unwed mother to block the adoption of her child by withholding consent, but denied the same right to an unwed father. The unwed father had only the statutory right to prevent termination of his parental rights by showing that adoption of the child by the petitioning couple was not in the child's best interests.

Generally speaking, Civil Code sections 224 and 7017, when read with section 7004, subdivision (a), mitigate against the harshness of the New York result by permitting a father with a significant interest in his child to gain an equal footing with the mother. However, notwithstanding a father's interest in his child, he cannot qualify as a section 7004 presumed father without the natural mother's cooperation. Hence, California's statutory scheme, while successfully distinguishing between natural fathers who are actively involved in their children's lives and welfare and those who are not, does not distinguish equally successfully between those with a genuine interest in their children and those without such an interest. In labelling the New York statute "another example of 'overbroad generalizations' in gender-based classifications," *Caban* noted, "The effect of New York's classification is to discriminate against unwed fathers even when their identity is known and they have manifested a significant paternal interest in the child." (441 U.S. 380, 394 [60 L.Ed.2d 297, 308].)

The court in *Caban* did not ground its holding in the special circumstances of that father's unique involvement in his children's lives, but simply stated that the statute "both excludes some loving fathers from full participation in the decision whether their children will be adopted and, at the same time, enables some alienated mothers arbitrarily to cut off the paternal rights of fathers." (*Ibid.*) Facially, California's statutory scheme has the same effect in cases where the father has manifested a parental interest in his child, but the mother has prevented him from developing a relationship with the child. (But see *W. E. J.* v. *Superior Court, supra,* 100 Cal.App.3d 303, 315.) We conclude, however, that the constitutional validity of Civil Code sections 7017 and 7004 must be assessed by the totality of circumstances present when the natural father seeks custody and the doctrine of parental preference is applied.

As noted *ante,* when a nonpresumed natural father claims custody to his child in opposition to petitioning adoptive parents, pursuant to section 7017, and the doctrine of parental preference is applied, the court must find that an award of custody to the father would be detrimental to the child and leaving custody with the prospective adoptive parents is in the child's best interests in order to terminate the natural father's rights and proceed with the adoption. (Civ. Code, § 4600, subd. (a); *In re B. G., supra,* 11 Cal.3d 679, 699.) Should the court fail to find detriment, the natural father will

gain *pendente lite* custody of the child and a consequent voice in the child's future. Whether viewed as obviating the need for an adoption (*W. E. J.* v. *Superior Court, supra,* 100 Cal.App.3d 303, 311) or as providing the natural father with the opportunity to qualify as a presumed father under subdivision (a) of Civil Code section 7004 (*In re Tricia M., supra,* 74 Cal.App.3d 125, 136; see also *In re Reyna, supra,* 55 Cal.App.3d 288, 301), the father has gained all that he sought.

Should the court find detriment, the father suffers no unconstitutional discrimination from subsequent termination of his parental rights, for he has demonstrated his incompetence to gain a further voice in his child's future. Under other circumstances, the ultimate result would be eligibility to free the child from his custody and control in any event. (Civ. Code, § 232, subd. (a)(7).) Accordingly, we hold that application of the parental preference doctrine to a nonpresumed natural father's claim of custody in a Civil Code section 7017 proceeding satisfies the requirements of constitutional validity noted in *Caban* v. *Mohammed, supra,* 441 U.S. 380.

### III

██ Finally, Steven asserts he was deprived of procedural due process of law when the superior court refused to expand the scope of the instant hearing to encompass a full evidentiary examination of the competing claims for custody. We deem it unnecessary to decide this issue on a constitutional basis. On the ground of simple error in the court's perception of the issues before it, we agree that reversal is required.

Although the court permitted Steven to offer some limited evidence related to his desire for custody of his child, the issue of custody never was explored fully either to assess "detriment" to or the "best interests" of the child. When counsel attempted to present additional evidence at the conclusion of Steven's testimony, the court stated, "I don't see any percentage in our proceeding further. . . . We don't need to hear any more to get past the question of presumed father. And besides, you have taken all the time you are going to be allowed, in any event. . . . We frankly, are going to have to go through the whole thing in the adoption hearing itself. . . . Now if they [respondents] didn't qualify, I would have to deny the adoption anyway. . . . I wouldn't [talk about Steven's qualifications], if I were you, because I didn't think his qualifications are—. . . Oh, I think they are probably at issue, but I haven't heard the other side, and I don't intend to hear the other side now, . . ." The court then indicated unequivocally that Steven would have no rights at the adoption hearing.

From the foregoing remarks, it is clear the superior court labored under the same misapprehension in the instant matter as that which led the court

into error in *In re Tricia M., supra,* 74 Cal.App.3d 125, 136-137. The issue of custody was *not* foreclosed because evidence disclosed Steven did not at that time qualify as a presumed father. Rather, the court erred in not deciding the custody claim independently of and prior to resolving the issue of parentage. (*Ibid.*)

In contrast to the proceeding in *Tricia M.,* Steven was permitted to present limited evidence on the issue of custody through his own testimony. However, he was prevented from presenting all the evidence he had to offer of relevance to the subject. Inasmuch as the court did not permit the full evidentiary exploration of the issue and made no ruling on the custody claim, the order must be reversed to permit full consideration of the issue. (*Id.,* at p. 137.)[2]

The order is reversed and the cause remanded for further proceedings in which the trial court is directed to hold a full evidentiary hearing on the issue of custody and to decide the matter in accordance with the standards enunciated in this opinion.

Hanson (Thaxton), J., and Lillie, J.,* concurred.

---

[2]*In re B. G., supra,* 11 Cal.3d 679, 699 reads in pertinent part: "Both the mother and the foster parents have urged us not to remand this case to the superior court but to render a final custody decision ourselves. Unfortunately, we cannot do so. The issue of custody is one committed to the discretion of the trial court. . . . Only in an exceptional case, in which the record so strongly supported a party's claim to custody that a denial of that claim by the trial court would constitute an abuse of discretion may an appellate court itself decide who should be granted custody; . . . ." We acknowledge the wealth of evidence which would support denial of custody to Steven, had the court so acted. But here, the court has neither exercised its discretion nor afforded Steven a full hearing. Hence, we will not interpose a judgment which may be premature.

*Assigned by the Chairperson of the Judicial Council.