Filed 4/27/22  P. v. McCormick CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RICHARD MCCORMICK,<br><br>    Defendant and Appellant. | A161946<br><br>(Solano County<br>Super. Ct. No. FCR340147) |

A jury convicted defendant Richard McCormick of multiple counts of sexual penetration, oral copulation, and lewd acts committed upon his two minor grandchildren and of continuous sexual abuse of his now-adult daughter throughout her childhood.  On appeal, defendant maintains the trial court erred in excluding evidence of specific, illustrative instances of his character for honesty, caring, and kindness.  We affirm.

BACKGROUND

*Prosecution's Case*

N.W.,[1] one of defendant's granddaughters, testified she understood she was in court because she "got touched" by defendant "[m]ore than one time."  The last instance of this occurred when N.W. was nine years old and sitting

_____

[1]  To protect personal privacy interests, we refer to witnesses by their first names or initials.  (Cal. Rules of Court, rule 8.90(b).)

on the couch in her home with defendant and her sister L.W.[2]  Defendant "[g]ot closer" to N.W. and then "held onto [her], and he touched [her]" on her shoulder and left arm.  Defendant then "dipped in [her] pants," touching "inside" her "private part" with "[h]is palm."  N.W. later told one of her older sisters, C.W., of the incident.  N.W. did not recall discussing other such incidents.

During a multidisciplinary interview, N.W. stated defendant touched her "area part" twice with one hand and that he also touched her "bottom."  In one instance, N.W. was on the couch with defendant and defendant left his hand inside N.W.'s pants until he "heard the garage open," indicating her mother (Mother) had arrived.  In the second instance, N.W. was on the couch at her mother's home with defendant and L.W.  N.W. said it "stung like a bee sting" when defendant touched her.  She later learned from L.W. that defendant simultaneously touched L.W.'s "area part."  N.W. told C.W. about the touching because C.W. "tells everything that is important" to their parents.  N.W. thought this was important because "grandfathers are not supposed to do that to . . . grandchildren."  A recording of N.W.'s interview was played for the jury.

L.W. also testified and stated defendant first touched her when she was in the first grade.[3]  Defendant "tried to . . . touch [her] body parts, and he tried to make [her] touch his body parts."  Defendant touched L.W.'s "private part" on the "outside" with his "private part" and "he pulled [her] pants down, and then he pulled his down"–such that "[p]arts of his skin touched [L.W.'s]."

---

[2] N.W. was eight years old at the time the incidents between her and defendant began.

[3] L.W. was nine years old at the time of this testimony.  The incidents between L.W. and defendant began when L.W. was six or seven years old.

2

L.W. stated that "[e]very time somebody came, he'll push [her] off so nobody would see." At one point, N.W. entered the room, stayed for "two minutes," then left, after which "he walked back over to where [L.W.] was sitting, and then he did it again." On "a different day," N.W. and L.W. told their older sister, C.W., "what was going on." In another instance, when "[L.W.] think[s] [she] was in second grade," the same conduct occurred. L.W. also told C.W. of this incident. On a separate occasion, defendant "laid on top of" L.W. while helping the family move. This stopped when L.W.'s father entered. Such conduct occurred "maybe five times."

L.W. further testified defendant "put his hands in [her] pants," touching "the outside" of "[her] private part" with "his hand skin." When L.W.'s brother "came downstairs," defendant took his hands away. Defendant told L.W. "not to tell nobody." L.W. again told her older sister. L.W. felt that defendant "just doesn't want to go somewhere where people don't like to go," meaning "jail," when defendant told her not to tell anyone about what happened.

In each of these instances, L.W. noticed that her body "hurt," testifying "[a]fter he did it, it started hurting." L.W. told her oldest sister that her body was hurting.

L.W. additionally testified defendant once told her to " '[p]ut [her] mouth on [his] private part.' " L.W. complied, and defendant "said to do something"—L.W. does not recall what.

In her multidisciplinary interview, L.W. said she was speaking with the interviewer because defendant "touched" her "private part." L.W. discussed the types of incidents she testified to and that defendant told L.W. to "suck his . . . private part," "four or five times." L.W. also said that "[h]e put his hands in my pants. He always does that when my mom's gone. . . ." L.W.

3

additionally stated that defendant "kisses [her] on the lips." A video of L.W.'s interview was played for the jury.

C.W., N.W. and L.W.'s second-oldest sister, testified she understood that she was in court due to "[a]n incident that happened with [her] two younger sisters and [her] grandfather."[4] On one occasion, she saw from "behind the couch" her grandfather laying on the couch in her family's home with N.W and L.W. "on each side of him." She could only see the tops of her sisters' heads, "laying" as if they were "dozing." Defendant went outside, after which L.W. said that " 'Poppa touched [her]. Like he stuck his hands in [her] pants, and he touched [her],' in her private area." N.W. told her "the same thing." The three sisters told Mother "about a day or too [*sic*] later."

Mother made a pretext call to defendant in which defendant claimed he "was asleep and then something happened and [he] asked a question, and it got told to [him] [by L.W.] that if [he] said anything that she said [he] made her do it." When Mother asked about defendant's conduct when she was a child, defendant said "I didn't penetrate ya. I didn't do anything to y'all but touch you in the wrong places and did things that's messed up."

Mother testified that in July 2018 her daughters approached her, and N.W. told her that her "father was touching her butt." L.W. said the same. Mother then asked her children to "[j]ust give [her] a second" as she "couldn't hear it, because [she] already knew what they were going to tell [her]" as "he did the same thing to [her] and [her] sister." After Mother told her children to " '[g]o ahead,' " they said he had "been touching them, making them do things that they didn't want to do."

Mother further testified that when she was "[m]aybe five, six" defendant started to "[t]ouch on [her], make [her] touch on him." Defendant

_____

4 C.W. was 15 years old at the time of her testimony.

touched Mother "[e]verywhere" on her body and made her touch "[h]is penis, his body, everywhere." During one such incident, Mother "had some friends over, [they] were in the backyard swimming, and everybody was outside, and then [she] went inside to use the restroom." Defendant saw Mother in the bathroom and touched "[her] vagina, [her] butt, [her] breasts, [her] mouth," "[made] [her] touch him, [put] his penis in [her] mouth."

Mother responded "both" when asked "[w]hen he would touch your vagina, did he touch your vagina from the outside or the inside?" and stated defendant would use "[h]is penis, his hands, his mouth." In some instances, defendant would ejaculate "[a]ll in his hand." After these events, Mother felt "[b]ad . . . [b]urning" and felt the same sensation when her daughter told her what happened to her. While engaging in these acts, defendant would say "[j]ust '[e]verything is okay. Be quiet. Dad loves you.'" Such incidents occurred "more" than 100 times and stopped when Mother "tried to kill [herself]" while in elementary school. The first time Mother confronted defendant about the incidents was during the pretext call with detective Steven Carnahan present. The video of that pretext call was played for the jury.

In July 2018, Steven Carnahan was a detective in the Family Violence Unit of the Fairfield Police Department and investigated this case. He is currently retired.

Detective Carnahan observed interviews in which N.W. and L.W. discussed the incidents that occurred with defendant. Detective Carnahan also facilitated a pretext call between Mother and defendant regarding the "abuse . . . that the suspect did to her when she was a child." Detective Carnahan arrested defendant based on his investigation, upon which defendant denied the allegations and "blamed the seven-year-old

5

granddaughter for sexually assaulting him." Detective Carnahan testified that defendant "said that he was laying on the couch asleep at the victim's house, and his seven-year old granddaughter unzipped his pants, removed his penis and was placing his penis in her mouth when he woke up. He then confronted her and said, 'What are you doing'? And she said, 'If you tell anybody, I'll say you made me do it,' according to him." Defendant also told Detective Carnahan "he rolled over while he was sleeping and placed his hand on [Mother's] vagina while she was sleeping" accidentally.

Dr. Blake Carmichael, PhD., testified as an expert in Child Sexual Abuse Accommodation Syndrome (Accommodation Syndrome).[5] Dr. Carmichael testified that the "language abilities and developmental stage of a child can . . . influence the way they recognize things" and describe them later.

Components of Accommodation Syndrome include "secrecy, helplessness, entrapment or accommodation." They can be thought of as "coping, . . . then delayed or unconvincing or conflicting disclosure." These components, "taken together," show "why a lot of kids don't tell quickly"; typically, the closer the relationship between the victim and perpetrator, the longer the delay in disclosure.

There are "a variety" of ways in which children respond to sexual abuse. "[L]anguage" and "organizational skills" can affect what might cause a child to add or remove details from a disclosure. In addition, "the more things that are similar that happened to a child, over time . . . the ability to make distinctions or discriminate between incidents is far more challenging." Furthermore, sexual abuse comprises "one component of the child's

_____

[5] Accommodation Syndrome is "an educational tool to help people understand a population of kids who have been sexually abused."

6

relationship with the perpetrator." It is a "misconception to say or expect a child not to care about or love their perpetrator, because . . . it's one component of that relationship. And so they still may enjoy being around that person, and smile."

### Defense Case

#### Defendant's Testimony

Defendant testified he did not sexually assault his daughter. He "did touch her" "[o]n accident" while he was "sleeping in the bed" when he "just started waking up, and [he] started feeling for [his] wife. And [he] was feeling all over [his] daughter. [He] realized it wasn't [his] wife. [He] jumped up and ran downstairs and talked to [his] wife." Defendant's "wife talked to [his] daughter," who was "probably seven or eight" at the time. Defendant answered "that's correct" when asked "[a]nd it wasn't until you reached the vagina that you realized you'd made a mistake?" and said he "had [his] eyes closed" and was "half asleep."

Following the incident with Mother, defendant began sleeping behind a locked door because he didn't "want nobody coming in while [he was] asleep." This continued until after all of defendant's children had moved out of his home as "[t]hey had keys to the house" and could "intrude on [his] privacy."

Defendant further testified that the only incident involving L.W. occurred when he was at "[his] daughter's house and [he] fell asleep on the couch. And at the time the house was full, and [he] was rudely wakened up. . . . [L.W.] was messing around down in [his] private part area." "She was trying to zip [his] zipper down," waking defendant. "[He] asked her where did she get that from, and she told [him] if [he] said anything that she would say [he] made her do it. And [he] left the house at that time." Defendant was "scared" following the incident because he "had touched [his]

7

daughter" and "thought [Mother] would think [he] messed with her daughter." When asked "you said it was like a demon had come out of [L.W.]; is that right?" defendant answered "[y]es" based on "[h]er facial expression . . . and how she said it." The only instance in which defendant discussed this incident with anyone was with Mother during the pretext call.

Defendant further testified he did not immediately discuss the incident involving L.W. with anyone, as he did the incident with Mother, because "[a]s [Mother] grew up . . . and once she got married, she came and she talked to [him] again about it. She brought it up to [him], saying that [he] did all kind of stuff to her." Defendant thought "that [Mother] would . . . believe her because she believed that [he] messed with her."

Defendant testified there had been no incidents involving N.W.

### *Defense Witnesses*

At the trial management conference, defendant presented written statements from four individuals he intended to call as character witnesses. The prosecution then filed a supplemental motion in limine to limit defense character evidence to that pertaining to relevant character traits and which would not consume an undue amount of time. The court stated it was "not going to rule on this" and that defendant could ask about honesty, kindness, and caring and that if "[he] want[ed] to go further than that, . . . [the court would] revisit this."

Thereafter, defendant's son testified his relationship with defendant was "perfect" and defendant had raised his children with "honesty above all. You know, you do something wrong, you own up to it." When the defense asked for "examples" of this, the prosecutor objected as calling for improper opinion character evidence. The court sustained the objection.

Thereafter the following exchange occurred:

8

"[Defense counsel] Q. Okay. Was he a caring parent?

"A. Yes, definitely, he was a caring person.

"Q. All right. And what do you mean by a caring person?

"A. Growing up, you know, some of the areas we grew up in with a lot of kids.

"[The People]: Your Honor, at this point I do have to object. The answer is veering into improper opinion character.

"[The Court]: I'll sustain. Sir, the rule on this is you can describe the character, but you can't give specific examples. And I know that's hard to do, but do you understand the difference?

"[The Witness]: Yeah, but that's not how to do with the question that he asked.

"[The Court]: I understand. So I'm going to ask him to ask you another question, but just so you know what the rule is, you can describe a person's character, but you can't turn around and do what might seem obvious and give an example of that."

Defendant's son then testified that after he and his siblings moved out of the home, he had remained close with his family, and that defendant had not discussed his sex life with him. The son was aware of a falling out between Mother and defendant in 2019 and assumed it was based on "this situation, only this situation. Her husband kind of, you know, wasn't doing his job, and my dad kept having to step in and take care of things."

Defendant's younger sister testified they were close, and she was in contact with defendant "constantly, frequently." She characterized defendant as a "very honest man," "[o]ne that I can always go to, and he can give it to me straight and uncut . . . and that has always been the case, as far

9

as I have known." Defendant was "[v]ery kind and caring." She also never discussed defendant's sex life with him.

After another of defendant's daughters testified defendant was "loving to everybody," the following exchange took place:

"[Defense counsel] Q. My apologies. Without giving any specific examples, how would you describe him with regards to his ability or with his interactions with other people and your siblings with regard to his ability to be caring and to his kindness?

"A. Basically, he was loving to everybody. So, I don't–

"Q. Can you elaborate a little bit on that?

"A. He always talked, our neighbors, conversations.

"[The People]: Objection, calls for improper character testimony.

"[The Court]: Ma'am, the way these questions are phrased are very difficult. Let me explain what the rule is, because it might help you with your answers. You can describe somebody's character, the quality of them, but you can't give us specific examples of that, which is–you know, it's kind of unnatural, but that's rule we have to ask you to follow. So . . . I'll allow you to ask a follow-up question if you'd like to.

"[Defense counsel] A: Okay.

"Q. Would you say he was communicative?

"A. What?

"Q. Would you say he was a communicative-type person?

"A: Yeah.

"[Defense counsel]: It's hard to do without leading questions, your Honor.

10

"[The Court]: Well, you know, you can certainly ask–well, you can ask a leading question and see if you draw an objection. And I would give you some leeway there, so.

"Q. . . . Did he help out the family members?

"A. Yes."

Defendant's daughter also testified she had a "good relationship" with Mother and that Mother did not disclose any inappropriate conduct "until this situation." She also said defendant did not engage in any inappropriate conduct with her, and she did not discuss defendant's sex life with him.

*Verdict*

The jury convicted defendant of two counts of sexual penetration with a child under 10 (N.W.) (Pen. Code, § 288.7, subd. (b)), one count of lewd act upon a child (N.W.) (*id*., § 288, subd. (a)), two counts of oral copulation with a child under 10 (L.W.) (*id*., § 288.7, subd. (b)), one count sexual penetration with a child under 10 (L.W.) (*id*., § 288.7, subd. (b), two counts of lewd act upon a child (L.W.) (*id*., § 288, subd. (a)), one count of sexual penetration with a child under 10 (L.W.) (*id*., § 288.7, subd. (b)), and one count of continuous sexual abuse (Mother) (*id*., § 288.5, subd. (a)). The jury also made a special finding defendant committed two or more sex offenses against more than one victim in this case. The trial court sentenced him to a determinate term of 32 years and an indeterminate term of 270 years to life.

## DISCUSSION[6]

Generally, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or

---

[6] Our standard of review of the trial court's evidentiary rulings is well-established. "We review a trial court's evidentiary rulings under [Evidence Code sections 352, 1101, and 1102] for abuse of discretion." (*People v. Doolin* (2009) 45 Cal.4th 390, 437.)

11

evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).)[7] "Section 1101 of the Evidence Code limits the admissibility of so-called 'propensity' or 'disposition' evidence offered to prove a person's conduct on a particular occasion." (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 822–823.)

However, section 1102 contains a limited exception to section 1101, and states:

> "In a criminal action, evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation is not made inadmissible by Section 1101 if such evidence is:
> (a)  Offered by the defendant to prove his conduct in conformity with such character or trait of character.
> (b)  Offered by the prosecution to rebut evidence adduced by the defendant under subdivision (a)." (§ 1102, subds. (a)–(b).)

This does not mean, however, that a defendant can elicit testimony of specific examples of conduct that are illustrative of a characteristic or character trait. (See *People v. McAlpin* (1991) 53 Cal.3d 1289, 1309–1310 (*McAlpin*) [defense witnesses' "proffered testimony was intended to prove the relevant character trait [that the defendant was not a person given to lewd conduct with children] not by specific acts of 'nonmolestation,' but by the witnesses' opinion of that trait based on their long-term observation of defendant's course of consistently normal behavior with their children"]; *People v. Felix* (1999) 70 Cal.App.4th 426, 431 (*Felix*) ["[s]ection 1102 creates an exception to this rule in criminal cases for evidence 'in the form of an opinion or . . . reputation,' but not specific instances of conduct"].)  In short, while "specific instances of conduct" are not admissible under section 1102

---

[7] All further statutory references are to the Evidence Code unless otherwise indicated.

(*Felix*, at p. 431), "[l]ay opinion testimony is admissible under section 1102 when it is based on the witness's personal observation of the defendant's course of behavior."  (*Id.* at p. 430; see *McAlpin,* at pp. 1309–1310.)

Defendant nevertheless maintains the 1982 " 'Truth in Evidence' " Amendment, enacted through the passage of Proposition 8, nullified the longstanding rule excluding specific, illustrative examples of a defendant's conduct as character evidence.  Proposition 8 added article I, former section 28, subdivision (d) (now Cal. Const. art. I, § 28, subd. (f)(2)), which provides in relevant part:  "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code Sections 352, 782 or 1103." (Cal. Const. art. I, § 28, subd. (f)(2).)

The court in *Felix* squarely rejected the assertion that the constitutional amendment abrogated the rule excluding illustrative examples of the defendant's character.  (*Felix, supra,* 70 Cal.App.4th at pp. 431–432.) In that case, the prosecution advanced the argument that "even though section 1102 does not authorize the admission of specific instances of conduct, California Constitution, article I, section 28(d) nevertheless permit[ed] its use." (*Felix*, at pp. 431–432.)  Explaining why the prosecution was in error, the court stated:

> "Contrary to the prosecution's contention, article I, section 28(d) of the
> California Constitution did not abrogate the Evidence Code's
> foundational criteria for the admission of character evidence.  Prior
> cases have declared article I, section 28(d) preserved section 1101 by
> implication.  For example, in *People v. Perkins* (1984) 159 Cal.App.3d

646 . . . , the court held: 'The . . . "Truth–in–Evidence" provision expressly preserves . . . section[] . . . 1103. The retention of section 1103 also means the retention of section 1101. The Law Revision Commission comments to sections 1102 and 1103 refer to them as "exceptions (applicable only in criminal cases) to the general rule of section 1101 that character evidence is not admissible to prove conduct in conformity with that character." The text of 1103 states that the section exists as an exception to section 1101. An interpretation of the "Truth–in–Evidence" provision that retains section 1103 but eliminates 1101 is contradictory. Section 1103 cannot exist as an exception to a nonexistent rule. [¶] "The literal language of enactments may be disregarded to avoid absurd results and to fulfill the apparent intent of the framers." [Citation.] Were we to hold that [article I, section 28(d)] abrogates section 1101 in criminal cases, we would be reaching just such an absurd construction.' (*Id.* at p. 650, fn. omitted.) More importantly, section 1101 has survived because in 1986, after the electorate added article I, section 28(d) to the state Constitution, the Legislature reenacted that statute by a two-thirds vote in both the Assembly and Senate. (Stats.1986, ch. 1432, § 1,2, pp. 5129–5130; see *People v. Ewoldt* (1994) 7 Cal.4th 380, 390–393 . . . ; *People v. Scott* (1987) 194 Cal.App.3d 550, 554. . . .)

"Thus, section 1101 is still viable and excludes relevant character evidence except as specified in it. One exception mentioned in section 1101 is 'as provided in . . . Section[ ] 1102.' (§ 1101, subd. (a).) Since section 1101 expressly refers to section 1102 as an exception to it, the latter statute also survives intact. Section 1102 only permits character evidence in the form of an opinion or reputation." (*Felix, supra,* 70 Cal.App.4th at p. 432.)

Defendant's reliance on *People v. Harris* (1989) 47 Cal.3d 1047 (disapproved on another ground in *People v. Wheeler* (1992) 4 Cal.4th 284, 299, fn. 10), and *People v. Dalton* (2019) 7 Cal.5th 166 is misplaced. These cases dealt with section 787's prohibition on specific instances of conduct as a proving or disproving *that witness's* credibility, and as the Supreme Court observed in *Dalton* and *Harris,* that statute's former evidentiary prohibition was not preserved by the constitutional amendment. (*Dalton,* at p. 214

14

[amendment "abrogates Evidence Code section 787's prohibition on admission of specific instances of misconduct that are 'relevant only as tending to prove a trait of [a witness's] character' "]; *Harris,* at p. 1081.) This stands in marked contrast with sections 1101 and 1102, which were, as the court explained in *Felix,* expressly preserved by the amendment.

Here, in accordance with section 1102, the trial court allowed defendant to elicit testimony as to his character. His son testified that he is honest. His sister also testified he is honest, as well as kind and caring. The trial court sustained objections only to questions that sought specific examples of such conduct. Accordingly, the court did not error in preventing defendant from eliciting further testimony as to specific instances of conduct that purportedly illustrated these characteristics.

### *Prejudice*

But even if the trial court erred in excluding any or all of the testimony defendant sought to elicit, it was harmless as it is not "reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836; see *McAlpin, supra,* 53 Cal.3d at pp. 1311–1313 [error in excluding proffered testimony was harmless under *Watson* standard].) Indeed, any error was harmless even under the more rigorous *Chapman* standard of prejudice. (*Chapman v. California* (1967) 386 U.S. 18, 24 ["before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"].)

To begin with, defendant was able to introduce testimony by three character witnesses, and only a very small portion of their testimony was excluded.

Further, as we have recited, the evidence against defendant was overwhelming. His daughter and granddaughters described his criminal conduct in vivid detail. While Mother delayed her disclosures, and L.W. and N.W.'s lacked the ability to distinguish between several instances of abuse in detail, this was entirely consistent with Dr. Carmichael's testimony about the Accommodation Syndrome.

Finally, defendant's own account of his conduct was incredible. His claim that he did not realize he was touching a child instead of his wife when he admitted to touching his daughter in his bed, and that his then seven-year-old granddaughter "demonic[ally]" committed a sexual assault and told defendant not to tell anyone about the incident, was understandably rejected by the jury.

## DISPOSITION

The judgment is AFFIRMED.

16

_____
Banke, J.

We concur:

_____
Margulies, P.J.

_____
East, J.*

*Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A161946

17